Wilson W. CROOK, III, Plaintiff,

v.

Deane BAKER, Paul W. Brown, Gerald R. Dunn, David Laro, Robert E. Nederlander, Sarah Goddard Power, Thomas A. Roach, James J. Waters and Harold T. Shapiro, President of the University of Michigan, as the Board of Regents of the University of Michigan, Defendants.

No. 80 73347.

United States District Court, E.D. Michigan, S.D.

May 21, 1984.

George E. Bushnell, Jr., John K. Parker, Southfield, Mich., for plaintiff.

Peter A. Davis, Ann Arbor, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

### INTRODUCTION

Wilson W. Crook, III, a holder of the Master of Science degree in Geology and Mineralogy from the University of Michigan (hereinafter U of M or University) since 1977, filed his complaint in this action on September 3, 1980. Plaintiff alleged that defendants, acting under color of law, proposed to rescind his degree without due process of law and to thereby deprive him of rights, privileges and immunities secured him by the Fourteenth Amendment of the United States Constitution, in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1979) [1].

---

1. 42 U.S.C. § 1983 (1979) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any

Plaintiff sought a preliminary injunction from this court, enjoining defendants from the proposed rescission. On October 8, 1980, the court denied plaintiff's motion and on October 17, 1980, the Board of Regents of the U of M did indeed rescind plaintiff's degree.

After extensive pretrial proceedings and discovery, this matter was tried to the court for nine days ending December 13, 1983. The parties thereafter provided the court with voluminous post-trial briefs.

On the basis of the findings of fact and conclusions of law outlined below, this court will enter a mandatory permanent injunction ordering defendants to restore the Master of Science degree previously conferred upon the plaintiff by the U of M, which the court finds to have been rescinded without due process of law as plaintiff has alleged. The purported act of rescission of October 17, 1980, is declared a nullity; judgment will enter for plaintiff, and plaintiff will be awarded reasonable attorney fees and costs, upon proper petition to the court, pursuant to 42 U.S.C. § 1988 (1980).

In accordance with F.R.Civ.P. 52, the court states its findings of fact and conclusions of law as follows.

## FINDINGS OF FACT

### I. OBTAINING THE DEGREE

Plaintiff Wilson Crook enrolled at the U of M in the fall of 1975, and was awarded the degree of Master of Science in Geology and Mineralogy on April 30, 1977. He had become interested in the study of the rare earth pegmatites of central Texas as an undergraduate at Southern Methodist University (SMU), and selected the U of M for his graduate work to study under Dr. E. William Heinrich, Professor of Mineralogy and leading authority in nuclear geology, who was known for his interest in Texas pegmatites. Plaintiff's professors at SMU had used Heinrich's text, and plaintiff himself had earlier written Heinrich for, and obtained, a copy of one of the latter's treatises.

Professor Donald Peacor, who taught X-ray Crystallography at the University's Department of Geology and Mineralogy, was also a friend of one of plaintiff's SMU professors. He testified that he examined the mineral collection which plaintiff brought with him from Texas and told plaintiff that with modern methodology, it may well be a source of new discoveries. Peacor graded plaintiff with an "A" in X-ray Crystallography, and discussed becoming co-author with plaintiff in publication of plaintiff's studies of the atomic arrangement of new minerals. Peacor testified that he encouraged plaintiff to publish, and remarked to him on the similarity of the new mineral, Texasite, which plaintiff had discovered, to a synthetic compound which Dr. John Haschke of the University's Chemistry Department had manufactured earlier and given Peacor.

In May of 1976, plaintiff and Dr. Heinrich visited the Barringer Hills of Texas on a geological expedition. The area has been studied by geologists for the past century, has been the subject of a large body of literature, and has been the source of numerous discoveries.

At the University, plaintiff became a teaching assistant, participated in the Department's Friday afternoon gatherings at a local tavern, became president of a student organization, acquitted himself well in his course work, and worked on his thesis. He shared an office with another of Heinrich's graduate students: Don Alexander, a PhD candidate. William B. (Skip) Simmons was another Heinrich PhD student at the time. Indeed, there were only three, and

State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

plaintiff was Heinrich's only Master's candidate.

The departmental ambiance was marred, however, by bitterness and animosity between Dr. Heinrich and the young Dr. Eric J. Essene, who was a nationally respected authority on the newer discipline of electron microprobe analysis, which had developed since the 1950's. It appears that they each regularly gave poor grades to the other's proteges, and Essene openly expressed animosity to plaintiff, and to plaintiff's wife as well. Dr. Heinrich testified that their relationship was one of "scientific adversaries," which gave the added benefit of greater challenges to their students.

Plaintiff's thesis was approved and signed by Dr. Heinrich, as principal advisor, and by Dr. Peacor as second reader on April 11, 1977. The thesis is entitled "The Geology, Mineralogy and Geochemistry of the Rare-Earth Pegmatites, Llano and Burnet Counties, Texas." The Department Chairman, Dr. C.I. Smith, signed it as well. The purpose of those signatures, according to Dr. Peacor, was to attest that the work had been properly carried out, "as far as the signatories can ascertain." The authorship of a thesis was a prerequisite to a master's degree, although without a specified percentage weight, and there was no requirement that it be published or fit for publication.

Dr. Heinrich testified that plaintiff researched the thesis under his direction, and that Dr. Peacor was chosen as second reader because he also was interested in pegmatites. Among the faculty only Dr. Essene, however, was facile in analysis of rare earth minerals with an electron probe.

Although plaintiff's workpapers show what Dr. Essene describes as Dr. Peacor's handwritten comments on plaintiff's chemical normalizations, after which review plaintiff rewrote and Peacor finally approved the document, Dr. Peacor testified that plaintiff never consulted with him, and that he specifically directed plaintiff to consult with Dr. Essene on his analyses by electron microprobe. Peacor testified that the qualitative and quantitative analyses which purport to have been accomplished by microprobe for plaintiff's thesis required the highest caliber of expertise on the microprobe, and further would have required at least six hundred hours of probe work to have been logged at the University laboratory, in large time blocks over many months.

At trial, Peacor further testified that, although plaintiff's microprobe data was consistent with the samples analysed, his thesis contained errors which would indicate that the calculations had not really been done on the microprobe. Peacor further testified that, before his approval of the thesis, Essene had told him (Peacor) that Essene would never believe plaintiff's data. Nevertheless, because "a scientist must always trust the honesty, if not the ability, of another scientist," he approved the thesis. This, in spite of his abiding concern which he described at trial for the known fact that "Bathtub Minerals" (synthetic compounds passed-off as naturally occurring minerals) were a common and recurring problem which troubled him and the profession in general.

When plaintiff left the University in the spring of 1977, he left a mineral collection to add to that of the Department. Dr. Peacor said that he noted at about that time, however, that the synthetic compound given him by Dr. Haschke which was so similar to plaintiff's newly discovered Texasite, had disappeared from his laboratory.

Each of the Department's professors who testified at trial acknowledged that an advanced degree is essential to professional success in the field of geology.

## II. PLAINTIFF'S POST–DEGREE ACTIVITY.

Immediately after graduation, plaintiff moved to Colorado and commenced work as a geologist for the Mobil Oil Company. He continues there to this date. Peacor, who described plaintiff as his good friend and student, remained in contact by correspondence and telephone, and they continued to plan collaborative research. Plaintiff's the-

sis was being edited for publication by the *University of Texas Geological Survey,* while plaintiff published other articles describing other of his newly discovered minerals: Albrittonite, Nickelbischofite, and Holdawayite. He applied for and obtained certification of those minerals, as well as Texasite, from the International Mineralogical Association. Plaintiff's articles appeared in *The American Mineralogist,* the leading journal of the profession.

Later in 1977, Dr. Peacor visited plaintiff's Texas hills site and searched for Texasite, but found none. He also testified that he discovered in January of 1978 that the computer program, EMPADR, through which plaintiff had calculated the microprobe analyses of this thesis, was flawed and that all of its output was accordingly erroneous. He did not notify plaintiff, however, although aware of the forthcoming publication of the thesis. He did notify others whose research had been affected, and assisted in the rerun of some of their data.

Plaintiff wrote Professor Heinrich in October, 1978, asking who in the Department had discovered the most new species of minerals, so far. He noted that Peacor had named four, "and I now have 6 (the last one being approved this week)." Peacor testified at trial that, to the contrary, he has discovered between twenty-five and fifty new minerals, himself.

In 1978, plaintiff began to discuss collaboration on an article with Skip Simmons, who had also worked under Dr. Heinrich while plaintiff was at U of M. Simmons was at the University of New Orleans, and sent a small vial of the putative mineral Doverite to plaintiff for microprobe and carbon analyses. When plaintiff returned the vial to Simmons, the latter concluded that no carbon test had really been performed, or the sample would have been destroyed. Plaintiff argues that, for precisely that reason, he microprobed Simmons' sample but carbon-tested *another* sample, without telling Simmons: because the obviousness of the fact required no mention.

Simmons returned to the Department on sabbatical in the fall of 1978 and told Dr. Essene of the peculiarity of plaintiff's Doverite analysis. Essene told Peacor, and Peacor testified that he decided then (in December of 1978) to investigate plaintiff's thesis, his postgraduate publications, the more general aspects of his academic work at Michigan, and his conduct as a scientist at the University and thereafter. He testified that, although his colloboration with plaintiff had raised questions, Dr. Simmons had clearly discredited plaintiff's thesis research: the data had been fabricated. He was also concerned because his friend Garsby, a minerals dealer in Arizona, had told him he was fearful of liability if plaintiff was dealing in Bathtub Minerals.

Peacor further testified that he decided explicitly upon a secret investigation, because if forewarned or notified of a problem, plaintiff might conceal the truth. The integrity of science required this procedure, he said.

Because the Department was aware of the forthcoming publication of plaintiff's thesis, Peacor prevailed upon Dr. Heinrich to notify the *Texas Geological Survey* editors that questions had arisen concerning plaintiff's research. It could not be recalled at trial, however, what "questions" were described to the publishers: the EMPADR program flaws which had been discovered a year ago, or the forthcoming charge of fabrication.

## III. THE INVESTIGATION

To start his investigation, Peacor decided to obtain an analysis of Simmons' Doverite and compare it with plaintiff's analysis. This was done, and both the Department and plaintiff still claim vindication by this analysis. In the meanwhile, Dr. Essene checked the University microprobe time logs and ascertained that plaintiff had not spent sufficient time on the probe to have accomplished his research as claimed. That fact, together with plaintiff's return of the unspent vial of Doverite, confirmed their suspicions of a fabrication. It was

decided, then, to ask plaintiff for the original data of his microprobe research.

On January 25, 1979, Dr. Peacor wrote plaintiff, advised him of the error in the EMPADR program discovered the year before, and extended an invitation to either return to the University and rerun his data, or to send his computer cards to be rerun by the Department. As to the EMPADR program errors, he wrote:

There is no problem as far as theses are concerned, yours included, but there is a serious problem with respect to publication. Ethically, we cannot publish without at least making extensive checks.

He advised plaintiff that Heinrich had stopped publication of the thesis in the *Texas Geological Survey*, "consequent upon such a check." He further advised that plaintiff's return to the campus would have a "side advantage" in that Skip: "would appreciate your help based on your experience" in rare earth analyses; that "I am having fun with a batch of new minerals;" that "you'd enjoy seeing" the new data being generated; and that "everyone sends their best." The letter is signed, "cordially."

Simultaneously, several of the PhD candidates then in the Department were enlisted into the investigation. Philip Brown, a former friend of plaintiff, was engaged to call plaintiff and ask him to send along his data. Dr. Kelly, the Department's head, testified that he had contained the investigation to only those persons required to participate, in January, 1979. However, the assistance of the students became necessary. Also, he testified that the students inescapably learned of the investigation because the faculty became so deeply involved that they became unavailable to their present students. Dr. Kelly had directed that faculty attention be given to the investigation, as necessary, however, because of his concern that the integrity of the degree be protected.

Members of the Department conducted several scientific experiments, to double-check plaintiff's work. Those of which the results were "inconclusive" were discarded, and those with results apparently unfavorable to plaintiff were utilized in subsequent proceedings. Three experiments were done upon the Department's sample of plaintiff's Texasite. Of those, one supported the inference that it was synthetic, and was later produced against plaintiff.

On Friday, February 2, 1979, plaintiff returned to the U of M campus for the weekend to rerun his microprobe analysis on the computer. On that afternoon, the five gentlemen from the Department, Drs. Kelly, Heinrich, Peacor, Essene, and Simmons (still visiting from New Orleans) visited upon Virginia Nordby, the assistant to the University's Vice President for Academic Affairs, and obtained her approval of their plan to ascertain the truth as to their suspicions by secretly monitoring plaintiff's activity on the University computer.

Mrs. Nordby, an attorney, testified that the geologists told her plaintiff was returning to the campus, but not that they had invited him. They told her they had made an arrangement for access to any data which he generated. She saw no problem in their plans, told them to document their evidence, and to return when they had done so. The situation was unique in her experience, and she had been at the University since 1962. She testified that the geologists were unsure how to proceed because, although the Department was part of the School of Literature, Science and the Arts, the degree against which they contemplated proceeding had been conferred by the Rackham Graduate School. She felt that they clearly needed legal advice, and referred them to University General Counsel Roderick Daane for that purpose. She also advised them that the Dean of the Graduate School and the Vice President for Academic Affairs must be consulted before any steps whatsoever could be taken; and that a full written presentation would be required.

Later that afternoon plaintiff went to the tavern to which the Department retired each Friday afternoon. Dr. Peacor testified that he chatted briefly with plaintiff and exchanged pleasantries, but said noth-

ing of the problem in which the entire Department had become immersed. When challenged on cross-examination for duplicity, he recalled that after leaving the tavern he had tried desperately all weekend to reach students Brown and Perkins, to convey to them his extreme need to meet with plaintiff. On Sunday evening he went so far as to call plaintiff's hotel, but plaintiff had gone back to Colorado.

PhD candidates Philip Brown and Dexter Perkins were indeed well aware of plaintiff's whereabouts throughout the weekend. Brown had been assigned to maintain surveillance of all plaintiff's movements and activities while on the campus, and to transcribe all conversations. Brown filed a written report of his surveillance with the Department four months later, on May 23, 1979; and that report was ultimately introduced at the hearing later held on charges against plaintiff. It stated that plaintiff was forthright and normal in attitude. Dexter Perkins (an Essene protege) was assigned by Peacor to modify the microprobe data reduction program of the University computer so that the "Echo" code would indicate "off" when it was actually "on"; thereby leading a person who intended to keep his work product private to actually transmit it to other terminals. The computer code was further altered so that all of the plaintiff's activity would be transmitted to a terminal where Brown and Perkins monitored activity and obtained regular print-outs, at three hour intervals throughout the weekend. Perkins wrote his report on this activity to Peacor on February 5, 1979. Peacor testified that the procedure was necessitated by Dr. Kelly's directive that records be obtained for subsequent proceedings.

Plaintiff was never able to reproduce his prior work, that weekend. He testified that he was unable to establish his matrix, in order to make the run. Brown had called him in Colorado and advised that he prepare a matrix in advance, because it was a time-consuming task: but he had not done so. Plaintiff testified that he "was not terribly motivated," had no idea of any charge of falsification, did not know his

publication plans were at stake, had the flu at the time and, finally, no longer had his cards from his original pre-thesis computer runs. This last fact he was loath to admit, because he knew the Department set great value upon retention of all data. He testified that Philip Brown had told him, during Brown's summer 1977 visit to Denver, of the problems discovered in the EMPADR program and that he, accordingly, had re-run his data on another computer program (MAGIC–4) at the Bell Laboratory in Colorado. So, on this visit he was attempting to reproduce his data by use of his MAGIC–4 results. At the subsequent University hearing, Brown denied telling plaintiff of the EMPADR program flaws in summer of 1977: and Peacor makes much here of the fact that he had not discovered the flaws until January, 1978. Peacor's claim to have *ever* discovered those flaws is refuted by other testimony that a student had discovered them earlier, however.

At any rate, plaintiff failed to accomplish his assignment on the University computer. Nevertheless, he returned to Colorado that Sunday evening and, on February 8th, wrote to Peacor that his efforts had been a success.

As the second phase of their investigation, Drs. Peacor and Essene began to write and telephone geologists nationwide: indeed worldwide, soliciting evidence of any wrongdoing by plaintiff or evidence from which an adverse inference might be drawn. There is no evidence, either here or at the University hearing, of what the phraseology of the solicitations may have been. Moreover, responses which failed to inculpate plaintiff were concealed by Peacor because, as he testified, nobody asked to see them. Responses were obtained from Aichi University, Japan; University of New Mexico; U of M School of Public Health; Rockwell International Atomics Institute, Rocky Flats, Colorado; U.S. Geological Survey at Reston, Virginia; the *Canadian Mineralogist Journal*; the *American Mineralogist*; the National Museum of National History; the International Mineralogical Association Commission on New

Minerals; University of Illinois; University of Texas Bureau of Economic Geology; and more. Many of the responses appear to answer the question: "Would you have doubts of those parts of plaintiff's work of which you have knowledge, if you learned he was a fabricator?" But inasmuch as most contacts were by telephone, we shall never know. Some respondents also appeared to be answering the question whether they had ever seen plaintiff use a microprobe. Many of the responses were addressed, "To whom it may concern;" and many state that they hope they have provided useful evidence. Most of the responses related to plaintiff's post-degree activities in the professional world, particularly his claimed discovery of, and obtaining certification of, new minerals.

All unfavorable responses were, indeed, received as evidence against plaintiff at his University hearing. Only one respondent, Don Alexander, plaintiff's former officemate and still a PhD candidate, was present at the hearing. He wrote that he had no reason to doubt that plaintiff could use the microprobe. They had done so together.

Within the Department, scientific tests continued to be conducted to refute plaintiff's claims of new minerals. A spectographic analysis was done of one sample which produced "inconclusive" results and was accordingly discarded. Dr. Kelly performed a fluid inclusions analysis which produced a "null" result, and was discarded. The tests related to Nickelbischofite and Albrittonite, neither of which had been claimed as discovered at the time of the thesis. Dr. Kelly testified that, even if those test results had been furnished to plaintiff, they would have been of no assistance to him, in the search for the truth.

On March 1, 1979, Drs. Peacor, Heinrich, and Essene sent the results of their investigation to Virginia Nordby, enclosing a synopsis page and a six-page detailed statement of findings. Their cover letter recites their expectation that she will be "... shortening it considerably for the form in which it will be communicated to Crook, so

that he cannot fabricate additional data, yet have a fair hearing." It was not until discovery in this lawsuit that plaintiff or his counsel were provided any more than the "synopsis" of this report. First among its findings is the fact that "Crook's analytical results are so uniformly highly precise that they raise doubts as to their validity." Nordby consulted with General Counsel Daane, the Dean of the Graduate School, and the Vice President, and it was decided to proceed.

Dr. Alfred Sussman, who was Dean of the Graduate School at the time, testified that his first awareness of this problem was through the Department's March 1, 1979 letter to Mrs. Nordby. He conducted no additional investigation of the matter, and assumed that plaintiff and the Department had engaged in substantial interaction prior to the March 1st Report, because he was advised that plaintiff had returned to attempt to reproduce his results in February.

## IV. THE CHARGES

When the Department and Dr. Simmons visited Virginia Nordby on February 2, 1979, she had been responsible since 1975 for enforcement of codes of conduct and the drafting of procedures for such enforcement, for the various schools and faculties of the University. Janelle Shubert held the position of Graduate School Appeals Officer, and served as advisor to Dean Sussman on graduate appeals of grievances. Mrs. Nordby testified that the graduate school had no procedure for enforcing its Code of Conduct in 1979; and that the code had never been enforced. She was in error, in that there were indeed procedures in place for enforcement of that code. When she forwarded the Department's March 1 charges of fabrication to Dean Sussman, she inquired as to what code or procedure should be followed, and he referred her question to Dr. Shubert.

Dr. Shubert testified that she advised Nordby that the Graduate School Code of Conduct applied, because she assumed the school's jurisdiction over plaintiff and over

the conduct charged. She did not, however, recommend that the established procedures concomitant with the code be followed. As Graduate School Appeals Officer, she had been responsible since 1976 for mediating the grievances of graduate students and establishing three-member panels, composed of faculty and students, to hear those grievances which could not be mediated. However, not one grievance in her experience had yet been required to actually be heard by a panel. She, Sussman, and Nordby determined that the complaint against plaintiff should be adjudicated by use of an adjusted version of the grievance appeal process, to eliminate all lower, mediatory, steps (inasmuch as the Department was the grievant and had presumably made its inalterable decision to pursue the matter to an adjudicative conclusion); and by further amending the grievance process to remove all student participation from the panel. Indeed, the hearing officials for this matter were later handpicked professors.

If the Graduate School Code Enforcement Procedures had been followed they too would have required students as well as faculty to sit on the hearing panel: and would have required a preliminary finding of probable cause by Dean Sussman, as well.

Dean Sussman testified that students would have been improper on plaintiff's hearing panel, because he was no longer a student. He was a professional, and to be judged as such.

Dean Sussman, Dr. Shubert, and Mrs. Nordby drafted the new procedure by which the case would be prosecuted. The Dean testified that the intermediate steps of the grievance procedure were particularly inappropriate, as plaintiff was the subject of the Department's complaint and it would be improper to contact him.

There was absolutely no precedent in University history for the procedure which was drafted, and the drafters specifically determined that no existing procedure was appropriate. Among existing University procedures was that of Regents Bylaw

5.09, the process required for termination of tenured faculty since the late 1950's, adopted at the insistence of the American Association of University Professors. That procedure provides for a full stenographic record of hearing, the presence of the subject's advisor or counsel at all sessions where evidence or argument are entertained, and direct and cross-examination of witnesses. That procedure had never yet been utilized, either. Moreover, the University's witnesses were unanimous at trial in their opinion that such procedure is the entitlement only of faculty, who constitute the backbone of a university, and who must be protected fully in any process jeopardizing their rights and professional careers. This process, according to the University's General Counsel's testimony at trial, was the most "elaborate and cumbersome" of all procedures within the University, but was required by demand of the faculty.

Nordby, Shubert, Sussman, and General Counsel Daane selected a five-member hearing panel of faculty, including one learned in computer science. The chosen chairman, Professor Gerald Rosberg, was a member of the U of M Law School faculty with whom Nordby had been particularly impressed on the faculty senate. She felt that his chairmanship would guarantee the observance of due process of law in all respects, during subsequent proceedings. The group was denominated the "Ad Hoc Disciplinary Committee."

On April 10, 1979, Dean Sussman wrote to plaintiff that the Department had charged him with fabrication and false presentation as original data of major elements of his thesis. He advised plaintiff of the constitution of an Ad Hoc Disciplinary Committee (Committee) by the Rackham Graduate School for hearing of the charge on May 14, 1979, and that "The possible consequences of this hearing include, but are not limited to, recommendation to the Regents that your degree be rescinded." He further advised plaintiff that the Committee's chair, a member of the law faculty, "will be without vote except to break a tie." Enclosed were the charge (i.e. only

the summary sheet of the Department's March 1, 1979 charges as filed with Sussman), the procedures (as planned by Sussman, Nordby, Daane and Shubert), the Committee roster, schedule, and "hearing agenda" (providing for the Department to make an uninterrupted case presentation, followed by plaintiff's uninterrupted case, then a response and question period and closing arguments).

Dean Sussman testified at trial that the Rackham Graduate School is endowed with implicit authority to investigate the postgraduate conduct of any former student, and that it may rescind the degree of any graduate for subsequent conduct unbefitting his discipline. It was on this basis that he proceeded against plaintiff. He noted that at least one or two cases of fraud occur on PhD theses, each year. Usually, however, they are discovered before graduation. His charge to plaintiff had quoted a portion of the Graduate School's Code of Conduct for students, including its authority to dismiss any student whose conduct is in violation of regulations. This was the authority on which the charge had been predicated. Sussman only sent the one-page synopsis of the Department's charges to plaintiff because the Department "gravely doubted" plaintiff's trustworthiness and did not want too much information passed to him.

The "Procedures" forwarded by Dean Sussman provided for a probable cause preliminary investigation by the Dean, for sufficiency of evidence. There was none. They provided that the chairman would only vote as tiebreaker; that the parties would submit all written documents at least *ten* days prior to hearing; that the hearing be "closed;" that a party could have an advisor present when the "party's testimony is required," and that the advisor could not argue, examine, or cross-examine witnesses; that minutes would be taken and a complete tape recording of proceedings would be kept for at least one year and for five years at the request of either party; that the Committee would report its decision and recommendations and basis therefor to the Executive Board of the Graduate School and a thirty day appeal period would follow. Thereafter, recommendations would move to the Vice President of Academic Affairs and on to the Board of Regents.

## V. ENTER THE LAWYERS

John R. Dethmers, a graduate of the U of M Law School and a general practitioner in Lansing, Michigan, was retained to represent plaintiff shortly after the Sussman charges of April 10, 1979. He testified that he made preliminary research which indicated that the University had no authority to rescind a degree. Then, noting the names of the Committee, he called its chairman to inquire further about the "Procedures" of which he had been notified.

Gerald R. Rosberg, Esq., a graduate of the Harvard Law School, and former law clerk to a United States Circuit Judge and United States Supreme Court Justice, was in his fifth year on the law school faculty, teaching civil procedure and legal process, *inter alia.* Despite his impressive credentials, Rosberg had no experience as a litigator. He had served on the Faculty Senate Advisory Review Committee, reviewing grievances on denial of tenure, for three years. Dr. Janelle Shubert had contacted him earlier and asked him to chair the Committee and, he testified, she made it clear that an adversary process was contemplated, that attorneys would be involved, and that he was selected because he was the only law faculty member on the Senate Committee. Rosberg had studied the Sussman procedure on receipt and, although thirty days notice to plaintiff was short, he felt that plaintiff could have responded in three hours if he had kept his original data. Rosberg assumed that the University retained jurisdiction over plaintiff, although the degree had already been conferred. He stated that he was aware, throughout, of the potential devastation to plaintiff of this proceeding, and that plaintiff's professional and scholarly standing could be severely damaged, if not destroyed.

Roderick Daane had been General Counsel of the U of M since 1970. He testified that he had no prior knowledge of Sussman's April 10th charges, although Nordby, Shubert and the Department had made inquiry of him in early April and he had advised them of the rudiments of due process. Nordby was mistaken, he said, in her testimony that she consulted with him in March; and the transcript (which plaintiff had made) of the University hearing was in error that Peacor had consulted him in January. Daane acted as advisor to the Department, Dethmers, and Rosberg in the establishment of ground rules for the hearing. At the hearing he acted as counsel for the Department's prosecution. After the hearing he added the role of legal assistant to Chairman Rosberg. Then, as University General Counsel he advised the Executive Board of the Graduate School and the University's Vice President on the presentation to the Board of Regents.

When Dethmers called Rosberg to inquire of the designated Procedures, and for a delineation of his role as a lawyer therein, Rosberg's testimony is that he told Dethmers he had learned on the Senate that the university community believed attorneys to be a hindrance in the search for the truth, and unsuited to university circumstances. He told Dethmers that the academic community is hostile to attorneys impeding the truth, and that these procedures had been designed accordingly, and reflected that attitude. He stated that his fellow committee members had those feelings and wanted no battle of gladiators. (The Committee, incidentally, had never met until the hearing opened in plaintiff's case.) He stated that his Committee wanted the group to sit around the table like educated people and resolve the problem; that cross-examination is the one most offensive part of an attorney's representation, in his experience, and that no hostile confrontations would be permitted. He felt, however, that Dethmers would be permitted to stay in the room throughout the hearing and make an opening statement. However, he must ask no questions of any person. If he had a question, he could pass it to the Chair, and the Chair might ask it. The five Department members could directly examine and cross-examine plaintiff, however, because they were not attorneys but *parties*. This included the visiting Dr. Simmons. All of the above advice, he testified, was given to help Dethmers shape his presentation to suit the taste of the fact finder.

Dethmers next called Sussman's office for an appointment and visited upon the Dean and Dr. Shubert on April 26, 1979. He still knew nothing of Mr. Daane, and was required to petition Sussman, by the terms of the Charge letter, for any adjournment of hearing. He thought that the "Procedures" served upon plaintiff were law and sought some refinement of their meaning. He told Sussman and Shubert that this was clearly a matter of magnitude, involving his client's career, but that the procedures were not designed to elicit the facts and the truth, and were completely inconsistent with his training as a lawyer. He appeared to be consigned to a meaningless role as his client's attorney. Sussman and Shubert told Dethmers to call General Counsel Daane.

The next day, Daane called Dethmers, and advised that Dethmers should direct all of his questions, in writing, to him (Daane). Daane also explained to Dethmers that academics have an aversion to courtroom proceedings and prefer to proceed by intellectual colloquy, by the reasoning of scholars together; that lawyers are not considered to be scholars in the University; and that the faculty is averse to advocates. It is noteworthy that no University witness ever attempted to reconcile this academic aversion to judicial proceedings with the "elaborate and cumbersome" hearing procedures of Regents Bylaw 5.09 which they had demanded and obtained, through their Association, to be followed before *their* relationship with the University could be terminated.

Daane told Dethmers that he would not be participating in the proceedings himself as a prosecutor, or advocate. He would merely serve as legal advisor to the Com-

mittee. Later, he testified, he was advised that the Committee desired no counsel, so he became counsel for the Department and therefore, when he wrote the governing "Procedures" (which were not observed) to Dethmers, those procedures accordingly became negotiated stipulations between opposing counsel. Dethmers testified that he believed Daane's rules to be Tablets from the Mount; that he obtained only one concession in the entire proceeding: an adjournment of the hearing. When he protested the May date, he was notified that the new date was September 22nd. Although, as will be discussed below, Daane answered many of Dethmers' questions, the exchange between them was not a negotiation process, and Dethmers never conceded the propriety of any of the proceedings which followed.

Dethmers wrote Sussman on April 27th, after Daane's call, thanking him for the meeting. He agreed to cooperate with the University, to the extent that plaintiff's basic rights would be protected. He wrote:

> As I believe you realize, the issue is much greater than the existence or non-existence of certain alleged minerals. It goes to the essence of Mr. Crook's integrity, his professional standing, and his career. I will, therefore, be concerned over the protection of any such fundamental rights as he may have.

Dethmers was advised that, before the University would disclose any information whatsoever to him concerning plaintiff, the Federal Privacy in Education Act required that plaintiff first provide the University with a release. Plaintiff addressed his authorization of Dethmers to Dean Sussman on May 1, 1979. The imposition of this requirement upon Dethmers is the University's first and only acknowledgement of any entitlement in plaintiff to any right to privacy, whatsoever. It occurred amidst a worldwide secret distribution of accusations that plaintiff was a scientific thief and liar; and Dr. Peacor testified that, even as he spoke at trial in this court, his contacts to ascertain plaintiff's postgraduate conduct continued.

On May 1, 1979, Dethmers wrote his procedural questions to Daane as directed. His letter posed seventeen major questions, with numerous subsidiaries. Of those, a memorandum previously written by Dr. Shubert indicates he had already raised fourteen at his visit to Dean Sussman.

Mr. Daane drafted his "preliminary reactions" to Dethmers' inquiries and circulated them for comment among Dean Sussman, Drs. Kelly and Peacor of the Department, Dr. Shubert, Chairman Rosberg, and Mrs. Virginia Nordby. Chairman Rosberg's response indicated satisfaction, except concerning the role of Dethmers at the hearing. He felt that Dethmers need not be *completely* limited to "whispering in his client's ear" at hearing, as Daane proposed, but should be permitted to simply make an opening statement for his client. On May 23, 1979, Daane responded to each of Dethmers' inquiries, and some portions of this exchange should now be examined. Daane testified that, by the time he wrote the May 23rd procedural refinements, he had become the Department's counsel and that by failure to negotiate changes thereafter, Dethmers entered into a stipulation with him on every point. This exchange included, *inter alia*, the following:

1. Dethmers wrote that Dean Sussman had indicated the charges sent to plaintiff were only a summary of a more extensive report, and asked for copies of all materials thus far submitted to the Dean, as well as a copy of the Dean's "probable cause" findings. Dethmers was *never* given either, or anything more than the one-page synopsis, until the Department's filing with the Committee of what Rosberg described as a "massive work" on July 20, 1979. Even that filing, however, failed to include the department's first report.

Daane's May 23rd response to the request was that the July 20th filing date which he had selected would leave Dethmers adequate time to prepare. Nothing was given until then.

2. As Sussman's procedures required submission of all documentary evidence

at least ten days before hearing, Dethmers asked for an opportunity for each party to review the evidence of the other.

Daane responded that he would serve all evidence on June 20th: plaintiff was to reply by August 1st, and then "we ought to be able to exchange any afterthoughts before September 1."

In actuality, Dethmers was unable to respond to Daane's massive "Statement of Charges" of June 20th until September 1st. After serving the Charges, Daane had also directed plaintiff to produce nine voluminous sets of data before August 1st, as well. Then, two days before the September 22nd hearing the Department filed another massive "rebuttal" compilation of additional scientific evidence and worldwide letters of reference.

3. Dethmers asked whether there would be an exchange of witness lists, and Daane agreed that there would. However, the Department produced unlisted witnesses at the hearing.

4. Dethmers asked whether depositions or interviews of witnesses would be permitted, as discovery. Daane replied that witnesses may be interviewed in the presence of the adverse party, but that no record would be made.

Dethmers then abandoned the taking of statements as useless, without a record. At hearing it developed that the Department had interviewed witnesses at will without notice to plaintiff. Daane testified that, at the time he responded to Dethmers' inquiry, he was not aware of the Department's plans.

5. Dethmers requested a means of presenting the testimony of absent witnesses, and asked whether affidavits or sworn interrogatories would be acceptable. Daane responded that "simple affidavits" would be accepted.

At hearing, however, the Department presented into evidence over 100 unsworn letters and notes "to whom it may concern" of mineralogists around the world.

6. Dethmers noted that the Procedures contemplated the taking of minutes and a tape, and asked "May we, at our expense, have a court reporter attend and make a record of the entire hearing?" Daane replied that neither the Committee nor the Department objected to plaintiff's hiring of a court reporter.

This arrangement was fortuitous indeed, because no minutes were taken, and if there ever was a tape recording it disappeared immediately after the hearing. The University kept no record of the event, whatsoever.

7. Dethmers asked whether witnesses would be sworn and Daane, while opining that "it does strike me as a bit more legalistic than we need to be," responded that Dethmers' court reporter could swear them.

At hearing, Chairman Rosberg announced that no one would be put under oath. Dethmers insisted and Rosberg finally agreed to an oath en masse, to all present although stating, "I think it does to some extent impair the spontaneity of the hearing."

8. Dethmers asked whether he would be permitted inside the hearing room only while plaintiff testified and whether he would be able to address the committee, even for opening statements, or only to speak with his client.

Daane responded that he may be present throughout, but that "as we discussed on the telephone, I see your role and mine as limited to whispering in our respective clients' ears." This advice was in contravention of Rosberg's direction that attorneys should make opening statements: and at hearing, Rosberg called upon Dethmers for opening statement.

9. Dethmers asked what degree of proof would be necessary to sustain a decision against plaintiff. Daane responded that the "clear and convincing standard of proof is appropriate."

In his opening statement, to the Committee, however, Daane stated that the Department bore the burden of proof by

a preponderance of the evidence. More-over, as discussed below, Chairman Ros-berg placed the burden upon plaintiff to explain away the charges and the De-partment was not required to meet any burden.

10. Dethmers asked what, if any, of the rules of evidence would be applicable; and Daane responded that none would apply, as the "... panel will contain only one lawyer who would understand them, anyway."

At hearing and to date, however, the Department has argued strenuously that one rule of evidence, misapplied, requires the finding against plaintiff that his the-sis was a fraud. That is Rule 404(b), relating to other crimes, wrongs, or acts. The Department's case, and the Commit-tee's decision, was that plaintiff's post-graduate conduct (based upon the letters "to whom it may concern" and his pre-tensions of the weekend of February 2, 1979) demonstrate that he is capable of fabrication and therefore resolve the question of whether he fabricated data for his thesis. The rule upon which the Department relies provides that other-acts evidence is "not admissible to prove the character of a person in order to show that he acted in conformity there-with." Nevertheless, as Department counsel it became the essence of Daane's case that this rule of evidence compelled a finding of plaintiff's guilt.

11. Dethmers asked whether plaintiff might present character witnesses, inas-much as his integrity was in question. Daane responded that he might, al-though the chairman might halt the cumulative, and that the Department "should be afforded the opportunity to offer rebuttal character evidence."

At hearing, Dethmers was to learn that the Department's case-in-chief con-sisted largely of bad character evidence, through solicited correspondence.

12. Dethmers wrote that "I remain un-aware of how the particular charges against Mr. Crook relate to particular rules, regulations, standards, etc., al-legedly violated. My situation is analo-gous to that of a lawyer defending some-one accused of a crime, but not knowing upon which particular statute the accusa-tion is based."

Daane responded with an excerpt from the "Code of Academic Conduct" of the College of Literature, Science and the Arts (the undergraduate school) and an announcement of the Rackham Graduate School, relating to on-campus student conduct.

When asked, at trial as he had been by Dethmers, of the University's authority to rescind the degree of a departed graduate, Daane testified that the authority to be-stow a degree implies the power to rescind it for a material mistake of fact. The Committee never answered that question at all, in its report; and plaintiff was never permitted to frame the issue to the higher decision makers in this matter.

## VI. THE HEARING

Plaintiff arrived at Dethmers' Lansing offices to prepare for the September 22 hearing on the day before, and was presented with the Department's second documented Statement of Charges, which had been mailed to Dethmers on September 19th. After a day of reviewing the new materials he, Dethmers, and their court reporter drove to Ann Arbor on Saturday morning, September 22nd, for the hearing.

The hearing lasted from nine o'clock in the morning until seven o'clock that eve-ning, with a break for a carry-in lunch on the premises. The Committee had never met before when Rosberg called the pro-ceedings to order. He announced at the start that, "Inasmuch as we don't want to hold another hearing again later, we will stay as long as necessary, today. After this, if more information is necessary we will seek it from outside sources."

Dean Sussman had enclosed a hearing agenda with his April 10th charges to plain-tiff. Plaintiff therefore held the expecta-tion that, in accordance with the Dean's agenda, the Department would first make a complete and uninterrupted presentation of

its case, which would be followed by his opportunity to make a complete and uninterrupted responsive presentation. This was not to happen. After accepting and distributing the Department's new September 19th Statement of Charges, Rosberg announced that the outline of issues which Dr. Peacor had also just handed to him would control the day's proceedings. No one had ever seen it before. The Peacor outline was a list of the department's claims, beginning with "I. Thesis analyses are fabricated," and ending at "IV. Lies and fabrications following thesis completion." Each claim included numerous subsidiary claims.

Having adopted the Peacor outline of issues, Rosberg proceeded to address them by adopting yet another procedure, of his own, which consisted of asking plaintiff to explain his defense to each point on the Peacor outline. When he felt a point had consumed too much time, he directed plaintiff to move on and explain another. Plaintiff never availed himself of a full explanation of any point during the entire day, because the five members of the Department (including Simmons) interjected their cross-examination at will, often at his midsentence. They also interjected their claims to the contrary and contradictions, and no one of them permitted plaintiff to complete an answer to another, or to Rosberg. The transcript is one of an all-day free for all.

More specifically, the record reflects that Dr. Kelly was first called upon for a long and uninterrupted opening statement of the charge that plaintiff has "fabricated, falsified and plagiarized data and presented it as valid science to this University and to the professional community at large." Then, plaintiff was asked to make his own opening statement. When he stopped after a brief opening, Rosberg stated "we'd rather you took the initiative and simply went forward and responded" to Kelly's major charges. Thereupon plaintiff began an explanation and was promptly interrupted by bursts of cross examination by Dr. Peacor. Rosberg then stated that Dethmers should now give an opening statement, although

"the participation of the lawyers should be kept at a minimum," and they may not cross-examine.

Dethmers began by challenging the University's jurisdiction over a former student, and Rosberg interrupted to advise that he should address that concern to the higher bodies to whom the Committee would make its recommendations. Then, Dethmers argued that a thesis cannot be rescinded on the basis of subsequent events; but was again interrupted by Committee Member Colburn's statement that the subsequent events seem to give a fair indication of a behavioral pattern.

Daane was then invited to give his opening, which included statements that the University may rescind any degree for a mistake of material fact; that postdegree events in this case were highly important, in that they demonstrated a continuing pattern of duplicity; and that the Department's burden was of proof by a preponderance of the evidence (contrary to his prior assurance to Dethmers).

Rosberg then announced that he would proceed with the department's framework of the issues, turned to plaintiff and stated "... I think it is appropriate for you to speak first and invite you to do that." For the remainder of the day plaintiff was cross examined.

Plaintiff offered a sample of his Texasite to the Committee for examination, and Rosberg asked Peacor if it would be helpful. Peacor advised that it would not, because "... being on a matrix which hasn't been extensively examined by experts ... is no evidence that the sample is natural." Peacor's statements at hearing that plaintiff's Texasite samples were worthless, being untested, were particularly odd, inasmuch as much of the Department time had been spent testing other samples of Texasite which had been left behind by plaintiff in 1977. Those tests, insofar as they were favorable to plaintiff, were concealed. None, apparently, were conclusive.

Plaintiff offered to perform his microprobe work again; and Dr. Essene stated

that *they were not questioning whether he could do, but whether he did the analysis.* This statement was a significant departure from the Department's charges and the Committee's later decision that plaintiff did not appear to have the *ability* to really have done the work.

Rosberg asked plaintiff to respond to the various letters submitted in evidence from absent witnesses who had not seen him use a microprobe; to explain what he had done on the computer when he returned to the campus on February 2; to explain his tests of Dr. Simmons' Doverite vial; and to give the names and addresses of various persons for later contact by the Committee, with the admonishment that plaintiff should not contact any of them himself.

Plaintiff offered to submit other data done for the thesis, such as his voluminous X-ray Crystallography analyses; Rosberg asked Dr. Kelly if it was necessary, and Kelly responded that it was not relevant because plaintiff was not charged with laziness. Plaintiff argued the excellence of various of his postgraduate studies; and Rosberg responded that examples of *good* conduct are irrelevant, because the Department had not charged that *all* of plaintiff's work was fabricated. When analysis of plaintiff's Texasite by outside experts was suggested, Rosberg stated "let's just begin our deliberations and see how it looks." When plaintiff offered the written testimony of a Ms. Taylor that he was indeed able to use a microprobe and had done so, Rosberg stated that as she was not present, unfortunately, "it is difficult to evaluate her representations." Plaintiff presented yet another written testimonial, to which Rosberg responded, "Does that person understand the charges against you?" Then, as plaintiff continued to offer character references which Dr. Kelly insisted were irrelevant, Rosberg stated that "Returns have long stopped diminishing. They are zero." Then, the following:

> I keep coming back to the point to shift the burden of proof onto you, Mr. Crook. It is rather the nature of the Department's charge that there is no direct evidence. No one saw you fabricate and no one claims there is direct evidence. What they have done, they have taken 25 or 30 different things and like they said "the only plausible explanation for this is fabrication of data.... The way one deals with that is to try and counter that with saying another explanation ... That's what we need and that is what we want you to have an opportunity to come in and provide."

With that, the hearing was concluded by Rosberg providing thirty days for plaintiff to file rebuttal to the department's September 19th filings, and for Rosberg to conduct his independent inquiries.

Concerning the hearing, Daane testified at trial that, although it was occasionally animated, it was not confrontational; that the interruptions were only conversational, in an exchange of views between colleagues expressing themselves around the table; and that the Chair fairly begged plaintiff to present some evidence to assist the Committee.

Chairman Rosberg testified that he followed neither the Sussman agenda nor the Department's, but his own, and that he had wanted each issue fully explored before moving to the next. He had started by calling for plaintiff's responses because the Committee was eager to see the issue joined, and because he felt there was substantial evidence that the thesis was fabricated before the hearing began. Rosberg had never shifted the burden of proof to plaintiff, he said, but the burden of producing evidence fell to him because the Department's evidence was persuasive that plaintiff could not use a microprobe. It had produced numerous testimonials of those who had never seen him use it.

Concerning plaintiff's alleged inability to use the microprobe, which was his downfall in this case, the position of PhD candidate Don Alexander, plaintiff's former officemate, is important. Early in the investigation, Dr. Peacor solicited from Alexander (who was then in Maryland) a written statement on plaintiff's microprobe ability. Alexander wrote Peacor that plaintiff had

utilized a mounting technique which permitted analysis of several samples on a single mount, and greatly reduced his time on the machine. Inasmuch as they used the microprobe together, he had seen plaintiff use it and assisted him in developing the skill. In preparation of his case, plaintiff had asked Alexander to write an affidavit on his behalf, that he could operate the microprobe, for the hearing; but Alexander responded that he could not do so, with apologies. Dr. Heinrich had told him (at the *least,* and accepting the Department's version) to "keep a low profile" in these proceedings. (He was, we recall, a Heinrich protege.) Nevertheless, the Department brought Alexander (still a candidate for his PhD) back to Ann Arbor for the hearing as a witness against plaintiff. When Rosberg asked Alexander "How would you rate Crook as a user of the machine?", Alexander responded:

> I felt he could handle it. I had no reason to think otherwise at that time. He was more capable of running x-ray equipment and I wouldn't dare touch it.

Although Dr. Kelly's opening had included among plaintiff's "lies" the claim that he used Don Alexander's time on the machine, Alexander acknowledged at hearing that plaintiff had indeed used some of his time. Also, that he "... helped Dub run his data as quickly as we could. We put together special mounts that would speed up his time." Then, when Dethmers (unable to resist on only this one occasion throughout the hearing) attempted to pose a question to Alexander, Daane quickly reminded Dethmers that he could ask no questions. On one occasion, Peacor cut off Alexander's voluntary statement. Finally, when plaintiff himself tried to ask a question of Alexander, Rosberg stopped him. At trial here, Rosberg stated that he did so then "because the tension level in the room had taken us into an area of difficulty." He had let plaintiff ask a few questions, "but it didn't work." Throughout the day, however, plaintiff was subjected to the questions, comments, and contradictions of Drs. Peacor, Essene, Kelly, Simmons and Heinrich.

Plaintiff and Dethmers testified at trial that they entered the hearing expecting the Sussman agenda to govern, and that the Department would be unable to meet its burden. Their optimism evaporated as the day passed and plaintiff became increasingly intimidated and exhausted. They had brought the sample of Texasite on matrix which Daane had demanded that plaintiff produce, to prove his innocence. Then, because Peacor said it was useless, it was ignored. It had also been considered irrelevant that plaintiff had been taught microprobe use in a geology department course, MME 562, in which he earned an "A."

## VII. THE ROSBERG COMMITTEE'S DELIBERATIONS

Before the September 22nd hearing closed, Professor Rosberg granted plaintiff thirty days in which to file a written rebuttal to the department's last charges of September 19th. Rosberg also admonished plaintiff, on the record, that he would contact the persons mentioned by plaintiff as sources of corroboration and that plaintiff was not to make such contacts himself.

At trial, Rosberg testified that he had explained to all concerned at the end of the hearing that the Committee was merely in recess, while its fact-gathering continued. He did indeed make outside contacts and gathered information for weeks, thereafter, and further testified that he was surprised (despite his admonishment to the contrary) that plaintiff did not deluge him with additional letters of reference, as the Department did thereafter. During the hearing he had made a list of approximately twelve names and institutions which had been prominently mentioned. He attempted to contact all of them, and more, to ascertain the truth of various facts in issue and to do so without, in many cases, revealing the reasons for his inquiry. He also attempted to contact those persons whose names plaintiff furnished him, post-hearing, as sources of corroboration.

The Department submitted no names for Rosberg to call, however, because it continued its independent investigations and submissions of *ex parte* evidence, of which more is written below. There is no record, and plaintiff has never been advised, of exactly what constitutes the entire body of information eventually acquired by Rosberg, during this post-hearing period, or of the identity of all persons contacted, either by the Department or Rosberg.

Within a week of the hearing, Rosberg encountered difficulty in comprehending the symbols of one of plaintiff's exhibits: calculations performed in preparation of his thesis. He sent it to the Department, with a request that they explain it to him, and was accommodated with a memo from Dr. Essene on October 1, 1979. Dr. Essene's memo not only explains what plaintiff's symbols "evidently" represent, but argues in detail thereafter that the calculations, including sums which "are those of Dr. Peacor who reviewed Mr. Crook's preliminary normalizations before completion of the thesis," would have all been unnecessary if the output of the EMPADR program had been available as claimed. Rosberg testified at trial that he had asked the Department to explain plaintiff's evidence because the Department was closer than plaintiff.

On October 19th, plaintiff submitted his rebuttal to the Department's September 19th charges. He argued against the credibility of the Department's evidence and submissions and presented new scientific arguments and evidence of the validity of his minerals and his data, both pre- and post-degree.

In the meanwhile on October 3rd, Daane had forwarded to Rosberg another substantial piece of departmental research. It consisted of an unsigned report on telephone calls purportedly made by Drs. Peacor and Essene, which were alleged to have produced numerous contradictions of various statements and claims made by plaintiff at hearing; new scientific evidence that plaintiff had recently published other new scientific falsehoods; and copies of two more of plaintiff's publications in scientific journals, which are described as falsehoods; and general findings on the incredibility of plaintiff as a witness at the hearing. Dr. Peacor testified at trial that this was done to set the record straight, after the hearing.

By letter of October 19th, Dethmers wrote to Rosberg protesting the post-hearing evidentiary submission of the Department, "containing new charges and reporting the Department's continuing investigation," as "clearly contrary to our understandings of September 27," and violative of "basic concepts of fairness."

On November 27th, Daane forwarded yet another statement from Drs. Peacor, Essene, and Simmons to Chairman Rosberg, with an offer to further respond to any additional questions the Committee may have. The geologist wrote that plaintiff's rebuttal and Dethmers' letter had been "so replete with misrepresentations that a very lengthy response could be made," and proceeded to discredit plaintiff's post-hearing rebuttal: specifically they cited the fact that plaintiff's microprobe expert is a Mobil Oil Company colleague of his and a personal friend, whose "independence may be open to question." Thereafter follow arguments against each of several scientific conclusions suggested by plaintiff, with the closing that the multitude of plaintiff's statements which remain unchallenged are not to be considered accepted as true; that many of those misrepresentations involve a knowledge of science not within the Committee's grasp; and that the Department would be pleased to clarify any questions.

Dethmers' protest to Rosberg of that third post-hearing submission by the Department, dated November 30, bears heavily upon the credibility of the Department, and of its only outside witness: Don Alexander. He wrote:

And Mr. Alexander, who impeached his own credibility by his various inconsistent statements both in writing and orally at the hearing, still remains, as I understand it, beholden to the Department for

a degree which he is still in the process of obtaining.

Rosberg testified that his Committee met between four and six times before his Report was published on March 7, 1980. According to the initial Sussman procedures there were only four voting members and Rosberg, the Chairman, was only empowered to vote to break a tie. But no vote was ever taken by the Committee. Instead, Rosberg said, he drafted his report "as a means of deliberation," and as his draft was discussed, a consensus developed around it. The end product was over 90% his. As his work was discussed, the consensus emerged that he had correctly ascertained that the Department had met its burden.

The Committee's report notes its responsibility to ascertain whether plaintiff had satisfied the requirements for his 1977 degree, or dishonestly submitted misrepresentations in satisfaction of those requirements; and begins by holding plaintiff's post-degree conduct relevant insofar as it sheds light on the question of what he did as a student.

As to the charge that the synthetic compound "Texasite" was falsely claimed to be a natural mineral, the committee could draw no conclusion and noted that it represented only a small portion of the thesis, anyway. No finding could be made about those minerals claimed to have been discovered post-degree, either.

On the charge that plaintiff fabricated the microprobe analyses of his thesis, however, the Committee found that plaintiff spent inadequate time on the machine, could not operate the machine, produced results which were too precise, had no original data to prove his innocence, had been unable to duplicate his work on the February 2nd weekend, had later falsely claimed to test Dr. Simmons' Doverite, and had been unable to prove the truth of his data on his post-degree discoveries Albrittonite and Nickelbischofite. Moreover, the Committee thereafter considered "whether Mr. Crook seems, on the basis of the evidence before us, to have been capable of acting deceitfully in reporting data on his thesis." Inasmuch as the evidence established a pattern of deceptive conduct after leaving the University, plaintiff was found guilty on this count.

The Committee was, however:

... not now prepared to recommend rescission of the degree. Much of the thesis is unchallenged by the Department, and the thesis itself was only one part—we do not know how large a part—of the work for which the degree was originally awarded. Because of our uncertainty about the standards for awarding the degree as well as for its rescission, we leave for the Executive Committee the task of determining what disciplinary action is now appropriate on the basis of the findings described in this report.

## VIII. THE EXECUTIVE BOARD OF THE GRADUATE SCHOOL

It will be recalled that the Sussman procedures required the Ad Hoc Disciplinary Committee to report its decision, recommendations, and basis therefor, to the Executive Board of the Graduate School, to which plaintiff was given 30 days to place an Appeal. The Committee made no decision or recommendations, however, but contented itself with sending one finding of fact to the Executive Board: the fact that data had been falsified in the thesis.

On February 18th, Daane had taken the precaution of writing the Dean of the Graduate School (by then, Dean Eugene K. Feingold), that he would shortly be receiving the Rosberg report, and that:

I write simply to make the suggestion that in conducting the review the Executive Board should not undertake a de novo hearing on the facts; that is to say, it should accept the facts as determined by the Rosberg Committee on the basis of the evidence adduced before the committee. The role of the Executive Board would thus be to review the appropriateness of whatever recommendations the Rosberg Committee makes on the basis of its findings of fact.

Although Daane testified at trial that he acted as counsel to the Department in his writings to Feingold, the University stationery on which this memorandum was sent bears the added, typed heading "OFFICE OF THE GENERAL COUNSEL."

On April 29, 1980, Dethmers hand delivered his appeal from the Rosberg report to the Dean's office and requested notice of, and the opportunity to appear at, the meeting of the Executive Board. Feingold's letter acknowledging report of the appeal noted that the Board would consider the matter soon, "perhaps on May 7."

The Dethmers appeal raised every argument plaintiff makes here: the University's lack of authority; the inapplicability of various rules cited; the absence of any recommendation by the Rosberg Committee; the unfairness of the proceedings in numerous respects; and the lack of an evidentiary basis for the Rosberg Committee's findings. Dethmers also protested the fact that on March 18th the geologists had filed an argumentative document with the Dean supporting rescission of the degree, and *adding* to the materials presented to the Rosberg Committee. Dethmers requested the Board's dismissal, forthwith, of all pending charges against plaintiff, his thesis, and his degree.

By letter dated May 7th, Daane wrote Dean Feingold (this time on stationery of the Office of General Counsel) that the Dethmers document was a "pyrotechnical argument of the sort lawyers sometimes address verbally to a jury," and thereafter made short shrift of it.

Dean Feingold testified that the Board met on May 7, 1980, and followed Daane's directive against a *de novo* hearing. It considered the Rosberg report and the documents filed thereafter by the Geologists, Dethmers, and Daane. There was, of course, no record of the hearing. The Dean could not recall that any vote was taken. Rather, a consensus was reached. There was not much debate, he said, because the matter was clear; and he could recall no discussion of Dethmers' arguments concerning a fair hearing. The min-

utes of the Board reflect that the meeting lasted forty-five minutes and that the Board unanimously recommended to the Board of Regents that the degree be rescinded. Only faculty members were recorded as present in the minutes.

Inasmuch as the next level of "appeal" lay to the Vice President of Academic Affairs, and Dean Sussman had ascended to that office, Dean Feingold determined (with Sussman's consent) that he should forward the matter to Vice President for Research Charles G. Overberger, instead.

In his forwarding letter to Overberger, Feingold mentioned that he also held available for review, if requested, the transcript of the Committee hearing and the evidence there presented, including plaintiff's thesis. Feingold testified that he thought he had a transcript, although he did not, and that the Board had not examined the evidence below, at any rate.

## IX. THE RESCISSION

On July 18, 1980, Vice President Overberger forwarded his Action Request to the Board of Regents of the University. He wrote that "I have reviewed the Report" (the Rosberg Committee's) and "concur with the recommendation of the Graduate School Executive Board that Mr. Crook's degree be rescinded and formally recommend that the Regents take this action." He enclosed for the Regents' consideration the Rosberg report, the filings made thereafter to Dean Feinberg by the geologists, Dethmers, and Daane, as well as Feingold's forwarding letter to him. No other material was presented to the Regents.

At the Regents' meeting of October 17, 1980, arguments of counsel were heard, of fifteen minutes each. Dethmers argued that plaintiff had been deprived of due process of law and counsel for the University, Peter A. Davis, advised that inasmuch as this court had denied plaintiff's request here for a Temporary Restraining Order, the Regents were authorized to proceed. Professor Kelly, head of the Department, assured that due process had been ob-

served and the Regents apparently deferred to his opinion because they then voted to rescind the degree. One Regent, Paul W. Brown, voted in favor of plaintiff against rescission. However, Dethmers was advised on the witness stand in this court, on cross-examination, that another vote had been taken after he left the Regents, and that the decision to rescind had become unanimous.

One of the Regents asked Dethmers, during his argument to them, what questions he would have asked, had he been permitted to cross-examine.

## X. THE AFTERMATH

On the heels of the Regents' rescission, an article on the matter was published in the Ann Arbor News, based upon a University press release. The headline was "Regents Rescind Student's Degree, Charging Fraud."

Plaintiff testified that he continues in his position at Mobil Oil Company, but has been removed from the "fast track" on which he had commenced. He now has diminished expectations of advancement, and feels immobilized from the possibility of advancement by transfer to other Divisions of Mobil or to other companies, by the events which have transpired. He underwent a siege of anonymous accusatory telephone calls for a period of time after the rescission and, although previously a healthy man, has developed stomach ulcers.

Professor Peacor testified that his investigation of plaintiff's post-graduate conduct continues, to this very day. He is presently inquiring, he said, into plaintiff's dealings in minerals in Arizona and into "all aspects" of plaintiff's conduct, when the occasion arises. Professor Essene agreed that the scientific investigation continues. They have published articles concerning plaintiff's fabrications in scholarly journals, and succeeded in obtaining the decertification of Texasite as a mineral by the International Mineralogical Association. The Department members uniformly testified that the Master's Degree is essential to a responsible job in the field of geology and mineralogy, and that the effect of a rescission thereof was always known to be devastating.

The court must note, in concluding these findings of fact, that particularly insofar as the merits of the falsification charge has any bearing whatsoever on the proceedings before this court, it is unable to attach any credibility whatsoever to the representations made by Dr. Donald Peacor either in the course of events at the University or here in this court, under oath. Dr. Peacor acknowledged on the witness stand that falsehoods and deceit are justified, in his mind, to protect the integrity of science; and time and again on this record those of his representations which were subject to a full examination turned out to be false. Much more of what transpired at the University was based upon representations by Dr. Peacor which remain partially unknown, or which cannot be evaluated for truth or falsity. The record stands in that posture because, of course, none of the statements made in the University's proceedings were ever permitted to be tested for their truth. To those of Dr. Peacor, however, this court can lend no credibility because of his numerous known false statements, even under oath, as well as his obviously overwhelming personal animus against this plaintiff.

Finally, inasmuch as General Counsel Daane has cast his credibility directly against that of John Dethmers by his insistence that Dethmers negotiated all procedures in this matter with him, stipulated to the manner in which the hearing would be conducted, and waived all due process rights and objections on behalf of his client, the court is required to record its findings as to his credibility. It appears that Daane, once committed to the success of this adventure, subverted many other of the University's more compelling interests and paramount values to its accomplishment. As the charges advanced, he assumed the role most advantageous to their success, and was far less than candid with those others who were drawn into the problem and with this court. At trial, he con-

1552

tradicted the testimony of both Peacor and Nordby in his testimony that he knew nothing of the problem until the die was, essentially, cast. He then advised Dethmers that his role was that of an impartial advisor, not an adversary. From that vantage point he proceeded to dictate the groundrules to Dethmers and this court finds his claim here of a "stipulation" to be completely incredible and contradicted by all other evidence in the case.

Moreover, Daane's representations to Dethmers as to the governing rules were breached, as he later determined necessary to the success of the Department's case. Daane testified, in fact, that he did not know the Department's plans, when certain "stipulations" (e.g. presentation of absent witnesses by affidavit) were entered. Accordingly, they were dishonored. Although Daane's groundrules to Dethmers required departmental proof to a clear and convincing standard, his opening statement to the Committee was that his burden was proof by a preponderance. The matter of the University's failure to make any record of the hearing despite the "stipulation" is a serious one, as are the matters of the service of additional charges upon Dethmers two days prior to the hearing and the several post-hearing submissions of additional facts. All of those acts were taken contrary to prior representations and understandings, and all done through Mr. Daane.

Mr. Daane's solicitude thereafter to each higher decision maker is reflected in *ex parte* communications made in the name of the General Counsel of the U of M, not as counsel for the Department appearing in an adversary role. Each of those officers, like Mr. Dethmers, might have acted differently had Mr. Daane given full disclosure of his posture in the matter. Dean Feingold, who was so careful as to select a Vice President for appeal other than Dr. Sussman who had filed the charges, might have cast a different light upon the counsel of Mr. Daane against a *de novo* hearing if Daane had not typed "Office of the General Counsel" at the top of his memo, and had stated that he was counsel for the charging party.

John Dethmers' testimony, conversely, is corroborated by every jot and tittle of evidence in this record. There was never a point at which he failed to raise all, or abandoned any, of the claims and defenses which plaintiff has brought to this court. He is credible in every respect; and the tenacity and ardor of his advocacy of the most fundamental principles upon which this republic rests throughout this unfortunate saga vindicates not only the honor of the University which produced him, but that of the legal profession as well.

## CONCLUSIONS OF LAW

This court has jurisdiction of the controversy here presented, pursuant to the provisions of 28 U.S.C. §§ 1331 and 1343(3).

The court will assume, without deciding, that the University is possessed of the legal authority which it claims to rescind a previously conferred academic degree. That question need not be decided to resolve this controversy. The authority, assumed *arguendo*, was exercised in such a manner that plaintiff must nevertheless prevail on his constitutional and statutory claims.

■ To prevail under 42 U.S.C. § 1983 (1979), plaintiff must prove that, 1) he was deprived of a right secured by the "Constitution and laws" of the United States, and 2) that deprivation was by a person acting "under color of law." *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970).

■ It is clear that defendants are persons acting under color of law within the meaning of 42 U.S.C. § 1983 (1979). Defendants are the president of the U of M and members of the Board of Regents of that university. The ultimate act complained of here, rescission of plaintiff's degree, was undertaken by defendants in their official capacities as agents of the University, an institution of higher learning authorized by the Constitution and laws of the State of Michigan to confer degrees.

Michigan Constitution of 1963, Art. 8, Sec. 4 and 5, M.C.L. §§ 390.1, *et seq.;* 390.11.

Plaintiff's claim is that the actions of defendants have deprived him of substantial procedural and substantive due process rights which are guaranteed to him under the Fourteenth Amendment.

## PROCEDURAL DUE PROCESS

Before a determination can be made of the quantum of process due to plaintiff, and of whether he was indeed afforded that process, it is necessary to determine whether plaintiff was deprived of any property or liberty interest recognized by the Fourteenth Amendment. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

Defendants contend that plaintiff has no interests protected by the Constitution because, *inter alia,* under Michigan law one does not have a right to an education, to earn a living, or practice a profession, but only a privilege to do so. This contention must fail. The Supreme Court "has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'" *Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971). It is thus unnecessary to a determination of whether any property or liberty interest is present in this case to discuss whether the award of plaintiff's degree was a right or merely a privilege.

"The question is ... whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), citing *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). " 'Liberty' and 'property' are broad and majestic terms. They are among the '[g]reat [constitutional] concepts ... purposely left to gather meaning from experience. [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains un-

changed." *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972), quoting *National Mutual Ins. Co. v. Tidewater Co.,* 337 U.S. 582, 626, 69 S.Ct. 1173, 1195, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting).

## PLAINTIFF'S PROPERTY INTEREST

Plaintiff maintains that he acquired a lifetime property interest in his degree, once conferred, and that defendants deprived him of that interest without due process of law by their act of rescission and the proceedings upon which the act was premised.

The courts have recognized property interests in many contexts. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare recipient's interest in continued receipt of benefits); *Slochower v. Board of Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) (tenured public college professor's interest in continued employment); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (interest of college professors and staff members under term contracts in continued employment); and *Connell v. Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) (public teacher without tenure or term contract has interest in continued employment where implied promise of same).

After synthesizing *Goldberg, Slochower, Wieman, and Connell,* the Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), enunciated the following standard for the finding of a property interest:

> Certain attributes of "property" interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely

**1554**

in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly, supra,* had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

*Id.* at 577, 92 S.Ct. at 2709.

■ Plaintiff has a legitimate claim of entitlement to his degree. His claim of entitlement is grounded in the U of M's stated requirements for the degree, its certification, through its faculty, that plaintiff has satisfied those requirements, the vote of the Board of Regents to award the degree to plaintiff in 1977, and the conferral thereafter. That legitimate claim of entitlement gives rise to a lifetime property interest in the degree.

Defendants argued that plaintiff had no legitimate claim of entitlement to his degree because he allegedly obtained that degree through fraud. This argument not only begs the question but is easily disposed of by the language of *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), quoted above, which indicates that the welfare recipients in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), had a [legitimate] claim of entitlement to welfare benefits grounded upon the welfare statute defining eligibility for payments, despite the fact that they had not yet shown that they were, in fact, eligible for such payments.

408 U.S. at 577, 92 S.Ct. at 2709. As the Court observed in *Roth,* the legitimate claim of entitlement of welfare recipients to continued receipt of benefits gave them the right to a hearing at which they could attempt to show that they were indeed within the statutory terms of eligibility. In the instant case, plaintiff's legitimate claim of entitlement to hold his degree for life gave him the right to a due process hearing at which the defendants could consider any charge that plaintiff had obtained his degree through fraud.

## PLAINTIFF'S LIBERTY INTEREST

■ The reasons broadly stated by defendants for rescinding plaintiff's degree; i.e., that plaintiff had fabricated the data underlying his thesis, and is thus a liar, a cheat, and a thief, as well as the actual rescission of his degree, constitute a deprivation of plaintiff's liberty interests.

■ Liberty interests subject to the protections of due process are present "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him ..." quoting, *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). *See, Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951). It cannot seriously be disputed that charging a scientist with fabrication of experimental data, especially when that data and that charge are published, diminishes his good name, his reputation, his honor, and his integrity.

■ It is not enough, however, that defendants' actions adversely implicate plaintiff's good name, reputation, honor, or integrity. In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court held that every defamation by a public official does not constitute a deprivation of liberty entitling one to the protections of procedural due process. *Id.* at 702,

96 S.Ct. at 1161. Something more is required. The Court reasoned that the language "because of what the government is doing to him" in *Wisconsin v. Constantineau,* 400 U.S. at 437, 91 S.Ct. at 510, "referred to the fact that the governmental action taken in that case deprived the individual of a right previously held under state law...." 424 U.S. at 708, 96 S.Ct. at 1164. Thus, for a liberty interest entitled to procedural protections to be found on the basis of defamatory conduct, that conduct must, in addition to imposing a stigma, be accompanied by the deprivation of a right previously held under state law, or result in an alteration of legal status, which justifies the invocation of procedural safeguards. *Id.* at 708–09, 96 S.Ct. at 1164–65.

This so called "stigma plus" test is easily met in the instant case. The complained of actions of defendants, in addition to placing plaintiff's good name, reputation, and integrity at stake, also resulted in the rescission of his degree, to which, as discussed above and below, plaintiff had a legitimate claim of entitlement.

### QUANTUM OF PROCESS DUE

■ The court's constitutional analysis does not end with the conclusion that plaintiff was deprived of property and liberty interests by defendants. It is well settled that in order to establish a deprivation of due process, one must establish that, a) he has been deprived of a protected property or liberty interest, and b) the procedures used by the state to effect this deprivation were constitutionally inadequate. *See, Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 847, 97 S.Ct. 2094, 2111, 53 L.Ed.2d 14 (1977); *Cleveland Board of Education v. LeFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 795–96, 39 L.Ed.2d 52 (1974).

The question of what procedural protections are adequate is addressed on the basis of the facts and circumstances of each case. Due process is a nebulous concept, incapable of fitting nicely into preconceived rules. In *Lassiter v. Department of So-*

*cial Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the Supreme Court stated:

For all its consequence, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230]. Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

*Id.* at 24–25, 101 S.Ct. at 2158–2159.

In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), a case involving a far lesser deprivation than the case at bar, the Supreme Court enunciated a three-pronged test to determine the quantum of process due in any given case:

First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural safeguards would entail.

*Id.* at 335, 96 S.Ct. at 903.

■ In weighing these factors, the court is mindful that the process to which an individual is entitled is in part determined "by the extent to which he may be 'condemned to suffer grievous loss.' " *Lassiter v. Department of Social Services,* 452 U.S. 18, 40, 101 S.Ct. 2153, 2166, 68 L.Ed.2d 640 (1981) (Blackman, J., dissenting), citing *Goldberg v. Kelly,* 397 U.S. 254, 263, 90

S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970), quoting *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Moreover, when the interest deprived is of great significance, the importance of insuring an increasingly error free process rises while, correspondingly, concerns about administrative inconveniences to government decrease. *See, Beitzell v. Jeffrey,* 643 F.2d 870, 874 (1st Cir.1981).

## PRIVATE INTEREST AFFECTED

The property and liberty interest of plaintiff in holding his degree for life and not having that degree rescinded wrongfully for scientific fraud are of great significance, and defendants' deprivation of those interests has caused plaintiff to suffer grievous loss.

Defendants' own witnesses testified unanimously that an advanced degree in geology is a prerequisite to a successful career in the field. Plaintiff's unrefuted testimony indicates that since the rescission of his degree he has been taken off of the "fast track" at Mobil Oil Company, no longer has any expectation of advancement, and in all likelihood would be unable to find employment elsewhere in his chosen field. Moreover, the rescission of plaintiff's degree for scientific fraud has damaged, perhaps irreparably, plaintiff's reputation, good name, integrity, and honor as a scientist. It further appears that, as a result of these events, plaintiff has developed the physical problem of stomach ulcers.

Neither party has cited, nor has the court's research disclosed, even one reported decision in American jurisprudence involving the rescission of a previously conferred academic degree. Plaintiff's counsel has uncovered, however, a decision of England's King's Bench, dated before the birth of this nation, which recognizes the enormously significant interests which are implicated by the rescission of an advanced degree by the university which has awarded it. In that case, *Rex v. Cambridge University,* 92 Eng.Rep. 818 (1723), plaintiff, Dr. Bentley, to whom a doctor of divinity degree had been awarded by Cambridge University, brought suit against the university praying for a writ of mandamus to restore the degree of which the university had deprived him without a hearing in any court, for alleged contumacy in a civil suit and for the speaking of opprobrious words to a vice-chancellor of the university. That court ruled that an academic degree is "a great office, a dignity and a freehold. And it is a place for life." The court granted the writ to restore Dr. Bentley's degree because he had not been afforded a hearing.

## RISK OF ERRONEOUS DEPRIVATION

The court concludes that the procedures upon which defendants relied in rescinding plaintiff's degree presented a great risk of the erroneous deprivation of plaintiff's interests, and indeed could hardly have been better designed to prevent an orderly consideration of the case. The inquisitorial, circus-like free-for-all which constituted plaintiff's "hearing," as a whole, resulted in a great risk of erroneous deprivation, (even if those who heard were to have been those who decided). The lack of several specific procedural safeguards was particularly egregious, however.

First, plaintiff was not given adequate notice of the charges and evidence against him or sufficient time to adequately prepare to be heard. This fact greatly hindered plaintiff's ability to prepare any defense to the charges against him, a result intended by his accusers.

Second, plaintiff's counsel was not allowed to participate meaningfully in the hearing. Had plaintiff's counsel been allowed to more fully participate at the hearing, with at least the opportunity to question witnesses on direct and cross-examination, the fact-finding process would have been greatly facilitated, and the risk of erroneous deprivation reduced.

Third, neither plaintiff nor his counsel was given a meaningful opportunity to confront and cross-examine the witnesses who appeared at the hearing and testified

against him. This fact greatly increased the risk of erroneous deprivation because the facts underlying the Department's charges were highly disputed and the credibility of witnesses was at issue. No witness was ever fully examined, and no subject ever fully explored.

Fourth, the evidence adduced at the hearing before the Ad Hoc Disciplinary Committee was not seen or heard by the Board of Regents, the body that made the ultimate decision to rescind plaintiff's degree. Not even a record was transmitted to any level of decisionmaking. This fact increased the risk of erroneous deprivation because, as a result, the Board of Regents decided disputed questions of fact, many of which turned on the credibility of witnesses, on the basis of the Ad Hoc Disciplinary Committee's written interpretation of the evidence, if indeed even that was considered.

Fifth, the Ad Hoc Disciplinary Committee considered over 100 letters from various persons throughout this country and the world regarding plaintiff and his work. Other intermediate decisionmakers considered even more, new, paper evidence. The fact that the letters were not submitted under oath and their authors were not subject to cross-examination, or even necessarily aware of the use made of their statements, greatly increased the risk of erroneous deprivation. The Committee had no way of determining what the authors of the letters knew about plaintiff, his work, or the bases or applicability of the matters expressed in the letters.

Sixth, plaintiff was not given an adequate opportunity to be heard and present evidence on his own behalf. Where, as here, factual disputes are at the heart of the controversy, preventing one side of the controversy from presenting his side of the story greatly increases the risk of erroneous deprivation.

## GOVERNMENT'S INTEREST AND THE BURDEN OF ADDITIONAL SAFEGUARDS

The court recognizes that a university has a weighty interest in the upholding of its academic integrity and, more specifically, in ensuring that students not fraudulently obtain and retain the status and benefits which accompany its degrees. Adequate procedural safeguards for those accused, however, do not diminish the university's interests, but do, in fact, advance the integrity of the institution and of the degrees it confers, as well.

Adequate procedural safeguards serve to ensure that a graduate's degree is not arbitrarily rescinded at the insistence of university faculty who are acting in bad faith, for ulterior motives, after that student has possibly became a peer of the moving parties. The arbitrary rescission of a degree, after a university has supposedly determined with all due deliberation that one has met all of the requirements for that degree, damages the university's academic integrity as much as, if not more than, the student's fraud in obtaining the degree. A fair hearing makes it much more difficult for faculty members acting in bad faith to force the institution into an arbitrary, capricious, and erroneous deprivation and, at the same time, increases the likelihood that *bona fide* charges of fraud will be established and stand.

Moreover, the court finds that additional procedural safeguards would have imposed only a minimal administrative burden upon defendants. Although the rescission of an advanced academic degree is not unprecedented, fortunately it is an event which occurs infrequently. The procedures that due process requires in this context could possibly be burdensome in other more frequently occurring contexts, but not here. Moreover, a simple due process hearing in this case would have been far less burdensome to the university (if not the moving parties) than the innumerable contrivances which were undertaken to avoid such an event.

## PROCEDURAL PROTECTIONS REQUIRED IN THIS CASE

■ Having considered and weighed the factors set forth in *Mathews v. Eldridge*,

*supra,* the court finds that the Due Process Clause of the Fourteenth Amendment of the United States Constitution required that plaintiff be afforded at least the following procedural safeguards before the defendants might proceed, constitutionally, to rescind his degree, again assuming *arguendo* the authority to rescind:

1) adequate notice of the charges and evidence against him, given sufficiently in advance of the hearing to allow for adequate preparation of a defense;

2) an effective opportunity to be heard and present evidence;

3) the opportunity to be meaningfully represented by counsel, and to have that counsel fully participate in all proceedings;

4) an effective opportunity to confront and cross-examine all adverse witnesses;

5) the opportunity to present evidence to the decision maker;

6) a decision based solely on the evidence adduced at the hearing; and

7) an impartial decision maker.

The court concludes, as a matter of law, and on the basis of the findings of fact made above, that plaintiff was deprived of protected property and liberty interests without being afforded those minimal procedural protections.

The procedural protections required in this case have been afforded to persons in other cases involving deprivations of property and liberty interests of far lesser significance than plaintiff's. The court will discuss a few of those cases, not for the primary purpose of comparing the interests involved, but to emphasize the importance of each procedural safeguard to a fundamentally fair hearing.

## NOTICE AND OPPORTUNITY TO BE HEARD

Notice and an opportunity to be heard, constitute the minimum process due whenever the Due Process Clause is applicable. The fundamental nature of, and symbiotic relationship between, these two procedural protections require that they be discussed together.

The Supreme Court in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), held that the Due Process Clause requires that a student facing suspension of 10 days or less "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581, 95 S.Ct. at 740. The Court's holding in *Goss v. Lopez, supra,* which prescribed minimum requirements of due process (for a 10 day suspension) was guided by several precedents, some of which are briefly discussed below.

In *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950), the Court said: "at a minimum ... [the Due Process Clause] require[s] that deprivation of life, liberty, or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." In *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914), the Court said that "[t]he fundamental requisite of due process of law is the opportunity to be heard," which "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to ... contest." *Mullane v. Central Hanover Trust Co.,* 339 U.S. at 314, 70 S.Ct. at 657.

In *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), Justice Frankfurter in a concurring opinion forcefully articulated the rationale for the requirement of an opportunity to be heard:

The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.

An opportunity to be heard may not seem vital when an issue relates only to technical questions susceptible of demon-

strable proof on which evidence is not likely to be overlooked and argument on the meaning and worth of conflicting and cloudy data not apt to be helpful. But in other situations an admonition of Mr. Justice Holmes becomes relevant. "One has to remember that when one's interest is keenly excited evidence gathers from all sides around the magnetic point . . . ." It should be particularly heeded at times of agitation and anxiety, when fear and suspicion impregnate the air we breath. Compare Brown, The French Revolution in English History. "The plea that evidence of guilt must be secret is abhorrent to free men, because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of informer undetected and uncorrected." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 [70 S.Ct. 309, 94 L.Ed. 317] (dissenting). Appearances in the dark are apt to look different in the light of day.

Man being what he is cannot safely be trusted with complete immunity from outward responsibility in depriving others of their rights. At least such is the conviction underlying our Bill of Rights. That a conclusion satisfies one's private conscience does not attest its reliability. The validity and moral authority of a conclusion largely depend on the mode by which it was reached. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done.

*Id.* at 170–72, 71 S.Ct. at 647–49 (footnotes omitted).

## RIGHT TO COUNSEL

Although plaintiff here was permitted to retain counsel to represent him during the proceedings leading to the rescission of his degree, counsel's role was so severely restricted as to be rendered so ineffective that plaintiff was essentially denied the right to counsel.

The importance of the right to counsel was recognized in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932): "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Id.* at 68–69, 53 S.Ct. at 63–64.

In *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Court held that welfare recipients were entitled to retain counsel to represent them at pre-termination hearings. The Court said that "[c]ounsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient." *Id.* at 270, 90 S.Ct. at 1022. *See, In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Plaintiff's counsel was not given the opportunity to employ these methods.

Defendants rely upon *Frumkin v. Board of Trustees, Kent State University*, 626 F.2d 19 (6th Cir.1980), in support of their contention that plaintiff here was not denied due process of law by the restriction of his counsel's role at the September 22, 1980 hearing before the Ad Hoc Committee.

Plaintiff Frumkin was dismissed from his tenured faculty position for alleged unsatisfactory performance. Frumkin filed suit in federal district court alleging that the university's refusal to allow his lawyer to conduct direct and cross-examination at the pre-termination hearing constituted a denial of procedural due process. The Sixth Circuit affirmed the district court's finding that the pre-termination hearing afforded Frumkin satisfied the requirements of due process. *Frumkin*, however, is distinguished on its facts from the instant case and, as discussed above, the quantum of process due varies with the facts and circumstances of each case.

The *Frumkin* court's holding was reached after application of the three fac-

tors articulated in *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976), quoted above. First, the court found that Frumkin had a substantial private interest in continued employment and, thus, that interest could not be terminated without due process of law. 626 F.2d at 21. Applying the second *Mathews* factor, risk of erroneous deprivation and the value of the additional procedural safeguards, the court concluded that "Frumkin had ample opportunity to present his case to the Hearing Committee in a manner calculated to achieve a fair result." *Id.* The court was unable to find that an expansion of Frumkin's counsel's role would have been of significant benefit to Frumkin because the Hearing Committee recommended *against* termination. *Id.* at 22. Applying the third *Mathews* factor, the government's interest, including the function involved, and the fiscal and administrative burden that the additional ... procedural safeguards would entail, the court concluded that although the administrative burden of allowing Frumkin's attorney to examine witnesses was minimal, the court would defer to the university's discretion in administration of its internal affairs because there was no showing that the overall procedure was prejudicial to the rights of Frumkin. *Id.*

Of course, the facts and circumstances of the instant case are markedly different from those in *Frumkin* and, accordingly, require a different result. Here, plaintiff did not have an opportunity to present his case to the Committee "in a manner calculated to achieve a fair result." Moreover, plaintiff has shown that the overall procedure to which he was subjected did, in fact, prejudice his rights. Thus, the court must conclude that defendants' reliance upon *Frumkin* is misplaced.

## CROSS–EXAMINATION

Cross-examination has long been recognized, despite plaintiff's accusers' distrust of the same, as one of the best methods of determining the truth. *See, generally, McCormick on Evidence*, §§ 19–32 (2d ed

1972). Plaintiff's counsel was denied outright any opportunity to cross-examine any adverse witness, despite the fact that any attorney trained in the art of cross-examination, as was plaintiff's counsel, is the one best able to employ its methods. *See,* Francis L. Wellman, *The Art of Cross Examination* (4th ed. 1936). Plaintiff too, as a result of the free-for-all character of the hearing, was denied any effective opportunity to confront the evidence and cross-examine the witnesses who testified against him, although he was nominally afforded that privilege.

The lack of an opportunity to confront and cross-examine adverse witnesses was especially important here because plaintiff flatly disputed the complex facts underlying the charges made against him. In *Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970), the Court states in this regard, "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." The Court in *Goldberg, id.* at 270, 90 S.Ct. at 1021, continues with the following quotation from *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959):

Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment .... This Court has been zealous to

protect these rights from erosion. It has spoken out not only in criminal cases, .... but also in all types of cases where administrative ... actions were under scrutiny.

360 U.S. at 496–97, 79 S.Ct. at 1413–14.

## EVIDENCE TO THE DECISION MAKER

The opportunity to present evidence to the decision maker was held required by the Due Process Clause in *Goldberg v. Kelly*, 397 U.S. 254, 268–69, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970), where welfare recipients were not permitted to appear personally with or without counsel, before the official who finally determined eligibility for continued benefits. Although the *Goldberg* Court thought it significant that most welfare recipients lack the education required to write effectively, and thus written submissions on their positions would be an unrealistic option, *id.* at 269, 90 S.Ct. at 1021, a consideration not implicated in the instant case, the Court also stressed that: "written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important. Particularly where credibility and veracity are at issue, as they must be in any termination proceedings, written submissions are a wholly unsatisfactory basis for decision." *Id.*

The District of Columbia Circuit in *Gray Panthers v. Schweiker*, 652 F.2d 146 (1980), relied upon *Goldberg v. Kelly, supra*, in holding that elderly medicare program participants who were permanently denied claims for benefits of less than $100 were entitled to direct oral communication with the decision maker before final denial. *Id.* at 172. The court found direct oral communication with the decision maker to be especially important where the claimant's "fault" was at issue, because fault "usually requires an assessment of the recipient's credibility, and written submissions are a particularly inappropriate way to distinguish a genuine hard luck story from a fabricated tall tale." *Id.* at 171,

quoting *Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

## DECISION BASED ON EVIDENCE

That a decision to deprive one of a liberty or property interest will be based only upon that evidence adduced at the hearing held to protect those interests is so consistent with common sense and any concept of fundamental fairness that many of the decisions have not had occasion to address the issue.

In *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), however, the Court said that the decision maker's conclusion "must rest solely on the legal rules and evidence adduced at the hearing." *Id.* at 271, 90 S.Ct. at 1022. The reason for such a requirement is that consideration of evidence adduced outside of the hearing would deprive the party against whom the evidence is offered of the opportunity to confront, cross-examine, and otherwise rebut the evidence. *See, Lonzollo v. Weinberger*, 534 F.2d 712, 714 (7th Cir.1976).

## IMPARTIAL DECISION MAKER

All of the procedural protections discussed above would be rendered totally useless without an impartial decision maker. The importance of this procedural protection to a fundamentally fair hearing was emphasized by the Court in *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980):

The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. *See Carey v. Piphus*, 435 U.S. 247, 259–262, 266–267 [98 S.Ct. 1042, 1050–1051, 1053–1054, 55 L.Ed.2d 252] (1978). The neutrality requirement helps to guarantee that life, liberty, or property will not be

taken on the basis of an erroneous or distorted conception of the facts or the law. *See Mathews v. Eldridge*, 424 U.S. 319, 344 [96 S.Ct. 893, 907, 47 L.Ed.2d 18] (1976). At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 172 [71 S.Ct. 624, 649, 95 L.Ed. 817] (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

*Id.* at 242, 100 S.Ct. at 1613. An impartial decision maker has been held required by the Due Process Clause in numerous other due process cases. *See, e.g., Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Morrissey v. Brewer*, 408 U.S. 471, 485–86, 92 S.Ct. 2593, 2602–03, 33 L.Ed.2d 484 (1972); *Rivera v. Marcus*, 696 F.2d 1016 (2d Cir.1982); and *Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C. Cir.1980). Here, the "decision" was cast by persons whose impartiality has been impugned, and adopted by defendants without hearing.

### SUBSTANTIVE DUE PROCESS

■ To prevail on his claim of violation of substantive due process, plaintiff must establish two elements: 1) that he has a constitutionally protected property or liberty interest; and 2) that defendants' arbitrarily and capriciously deprived him of that interest. *See, Board of Curators v. Horowitz*, 435 U.S. 78, 91–92, 98 S.Ct. 948, 955–956, 55 L.Ed.2d 124 (1978); *Stevens v. Hunt*, 646 F.2d 1168, 1170 (6th Cir.1981).

It is clear from the above discussion that plaintiff was deprived of his constitutionally protected property and liberty interests by the actions of defendants. The only question is whether that deprivation was arbitrary and capricious. The court concludes, as a matter of law, that it was. "In order to establish such arbitrary and capricious actions, ... [plaintiff] must show that

there is no rational basis for the University's decision ..." *Stevens v. Hunt*, 646 F.2d 1169, 1170 (6th Cir.1981) (citations omitted). In the instant case, on the basis of the findings of fact made above, the court concludes that there was no rational basis for defendant's actions.

### CONCLUSIONS

Having found that the procedural and substantive due process rights of plaintiff were violated by defendants acting under color of law, the court concludes that plaintiff has prevailed on his 42 U.S.C. § 1983 claim. Once a violation of § 1983 is found, the court has broad equitable powers to remedy that violation. Accordingly, the court by this order enjoins defendants to restore the Master of Science Degree previously conferred upon plaintiff by the University of Michigan. It is, moreover, the judgment of this court that the act of rescission is a nullity.

IT IS SO ORDERED.