813 F.2d 88
 38 Ed. Law Rep. 81
 Wilson W. CROOK, III, Plaintiff-Appellee,
v.
Deane BAKER, Paul W. Brown, Gerald R. Dunn, David Laro,
Robert E. Nederlander, Sarah Goddard Power, Thomas A. Roach,
James J. Waters and Harold T. Shapiro, President of the
University of Michigan, as the Board of Regents of the
University of Michigan, Defendants-Appellants.
 Nos. 84-1372, 85-1118.
 United States Court of Appeals, Sixth Circuit.
 Argued July 24, 1986.
Decided March 5, 1987.
Rehearing and Rehearing En Banc Denied May 6, 1987.
 
 Peter A. Davis, Davis and Fajen, Ann Arbor, Michigan, for defendants-appellants.
 Eugene D. Gulland (argued), Covington & Burling, Washington, D.C., for Amicus Curiae Counsel.
 John Parker, Bushnell, Gage, Doctoroff, Reizen and Byington, Southfield, Mich., George E. Bushnell, Jr. (argued,) for plaintiff-appellee.
 Before KENNEDY and WELLFORD, Circuit Judges, and BROWN, Senior Circuit Judge.
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 This appeal raises the question whether a Master of Science degree that has been granted by the Regents of the University of Michigan may later be revoked by the Regents on the ground that the holder of the degree was guilty of fraud in procuring the degree and, if so, whether the University afforded due process of law in revoking the degree in this case. The district court assumed, arguendo, that the Regents could revoke the degree but concluded that due process of law was not afforded in revoking the degree and granted relief. We determine that the Regents had the authority to revoke the degree and that the procedure followed in doing so comported with due process requirements. Accordingly, we vacate and remand for dismissal.
 
 
 2
 Appellee Wilson W. Crook, III (Crook) was awarded such a degree. Thereafter, information came to the attention of the University that Crook may have fabricated data in his master's thesis, and Crook was advised that a hearing would be held to determine whether such was true, and if so, that his degree might be revoked. An Ad Hoc Disciplinary Committee (Committee) of University professors was designated to hear the charges. Crook was furnished with documents allegedly supporting the charges, to which Crook replied. A hearing was held at which Crook was accompanied by his attorney, following which the Committee filed a report finding that Crook had indeed been guilty of fraud but made no recommendation as to revocation of the degree. This finding was approved and revocation was recommended by intermediate authorities in the University hierarchy. However, before the Board of Regents of the University acted, Crook filed this action in the district court against the Regents to enjoin the rescission of the degree. When the district court denied a preliminary injunction, the Regents, having approved the finding of fraud and having accepted the recommendation, rescinded the degree.
 
 
 3
 In his complaint in district court,[1] Crook contended that the Regents could not, under Michigan law, revoke his degree once granted or could accomplish this only by a court proceeding; alternatively, Crook, relying on 42 U.S.C. Sec. 1983, contended that, even if the Regents had the power and authority to revoke his degree, they could accomplish this only by meeting the requirements of due process of law under the fourteenth amendment of the Constitution, which, he contended, they did not do in this case.
 
 
 4
 The district judge expressly assumed, without deciding, that the Regents could revoke the degree, provided due process was afforded to Crook; she then held a nine-day trial to determine what process Crook had received. Following this trial, the district judge filed a lengthy opinion in which she determined that Crook had not been afforded due process, declared the revocation of his degree to be a nullity, and ordered the Regents to restore the degree. 584 F.Supp. 1531 (E.D.Mich.1984). The district court also awarded substantial attorney fees and costs to Crook.
 
 
 5
 On appeal, the Regents contend that they did have the power and authority to revoke Crook's degree and that they afforded Crook due process of law in doing so. The Regents further rely on the eleventh amendment of the Constitution in contesting this judgment and contend that, in any event, the amount of the fee awarded to Crook's counsel is not supported by the record.
 
 
 6
 We conclude, as heretofore stated, that the Regents did have the power and authority to revoke Crook's degree and that the University afforded to him due process of law. We therefore vacate the district judge's judgment declaring the Regents' rescission of the degree to be a nullity and mandating that the degree be restored to Crook and awarding attorney fees and costs. This being our decision, we need not decide whether the entry of the judgment violated the eleventh amendment or whether the attorney fee awarded is supported by the record.
 
 
 7
 As we have stated, Crook's basic position has been that, under the law of Michigan, the Regents had not the power to withdraw or rescind his degree upon proof of fraud in the inducement no matter what process was afforded to him by the University. Crook's alternative position has been that, even if the Regents had such power, they must comply with the due process clause of the fourteenth amendment and that they failed to do so in this case.
 
 
 8
 It is obvious that if it were determined that the Regents had not the power, under Michigan law, to revoke the degree, that would have ended the matter, and it would have not been necessary, indeed would not have been proper, to have decided the federal constitutional question. That being so, the district court should have first resolved Crook's state law contention. "[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional ground for decision." Gulf Oil v. Bernard, 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981), quoted in Jean v. Nelson, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664, 671 (1985).
 
 
 9
 Although we could remand this cause to the district court for a determination of the state law question, we have decided not to do so. The parties have filed supplemental briefs, requested by this court at oral argument, directed to the state law question, and the question does not to any extent turn on a fact that is not in the record or is in dispute. This is already an old matter, the dispute having begun in 1978. We therefore believe it to be sound judicial administration for this court now to dispose of the state law issue.
 
 THE STATE LAW ISSUE
 
 10
 As heretofore indicated, this court at argument asked for supplemental briefs on the question whether, to rescind Crook's degree, Michigan law required a court proceeding. In this brief, Crook seems to argue that, by posing the question in this way, the court is improperly assuming that the degree could be rescinded even as a result of a full-blown proceeding in state court. Supp. brief at 2. We take this contention to be that the Regents could not, by charging Crook with fraud in the inducement and proving such fraud in a state court proceeding, under Michigan law, obtain a rescission or revocation of the degree. Therefore, Crook seems to argue that, under Michigan substantive law, fraud in the inducement is not a ground for rescission of the award of the degree. Crook cites no authority for this bald proposition, and we know of none. We reject the contention as unsupported in the law.
 
 
 11
 Crook's more plausible contention is that, under Michigan law, a full-blown court proceeding, such as would be necessary to rescind an executed sale of land or to rescind an executed gift of personalty, is required to rescind a grant of a degree. The argument is that the grant of a degree vests in the grantee a valuable property right, and the grantor, here the Regents, can no more rescind the grant than one can, without court action, rescind the sale of land or gift of personalty.
 
 
 12
 At the outset, we may say that we are surprised at the dearth of case law dealing with the requirements for the rescission of the grant of a degree and, more particularly, dealing with the question whether court action is necessary.[2] After reviewing the legal position of the University of Michigan under the state constitution and statutes and under case law, we conclude that the Regents had the authority, under Michigan law, to revoke this degree and that a court proceeding was not necessary to do so.
 
 
 13
 As recognized in Regents of the University of Michigan v. State, 395 Mich. 52, 235 N.W.2d 1 (1975), under article VIII, Section 5 of the Michigan Constitution of 1963 and prior constitutions, the University is a separate constitutional "body corporate known as the Regents of the University of Michigan," which Regents have "general supervision" of the University. The court further stated: "Michigan is one of the few states to give independent constitutional status to its universities." 395 Mich. at 74, 235 N.W.2d at 11.
 
 
 14
 In Regents of the University of Michigan v. Michigan Employment Relations Commission, 389 Mich. 96, 204 N.W.2d 218 (1973), the interns and residents at the University of Michigan Hospital organized an association and sought to bargain collectively with respect to compensation. The University administration refused, asserting its right unilaterally to determine compensation, and the Regents later also denied a written request to bargain. Thereafter, the Michigan Employment Relations Commission determined that the University was subject to the Michigan Public Employee Relations Act and therefore must bargain with the association of interns and residents as to compensation. The Michigan Court of Appeals reversed, Regents of the University of Michigan v. Michigan Employment Relations Commission, 38 Mich.App. 55, 195 N.W.2d 875 (1972), rev'd, 389 Mich. 96, 204 N.W.2d 218 (1973). While the Supreme Court of Michigan reversed the Court of Appeals, holding that the Public Employees Relations Act did apply and could constitutionally apply to the interns and residents of the University with respect to wage-bargaining, that court also said:
 
 
 15
 Because of the unique nature of the University of Michigan, above referred to, the scope of bargaining by the Association may be limited if the subject matter falls clearly within the educational sphere. Some conditions of employment may not be subject to collective bargaining because those particular facets of employment would interfere with the autonomy of the Regents. For example, the Association clearly can bargain with the Regents on the salary that their [sic] members receive since it is not within the educational sphere. While normally employees can bargain to discontinue a certain aspect of a particular job, the Association does not have the same latitude as other public employees. For example, interns could not negotiate working in the pathology department because they found such work distasteful. If the administrators of medical schools felt that a certain number of hours devoted to pathology was necessary to the education of the intern, our Court would not interfere since this does fall within the autonomy of the Regents under Article VIII, section 5. Numerous other issues may arise which fall between these two extremes and they will have to be decided on a case by case basis. Our Court will not, as it has not in the past, shirk its duty to protect the autonomy of the Regents in the educational sphere.
 
 
 16
 389 Mich. at 109-10, 204 N.W.2d at 224.
 
 
 17
 We conclude that there is nothing in Michigan constitutional, statutory or case law that indicates that the Regents do not have the power to rescind the grant of a degree. Indeed, the administrative independence granted to the University by the Michigan Constitution in educational matters indicates that the University does have such authority.
 
 
 18
 The Ohio Supreme Court was recently presented with the issue before us. Waliga v. Board of Trustees, 22 Ohio St.3d 55, 488 N.E.2d 850 (1986). There, Waliga and Taylor had received Bachelor of Arts degrees in 1966 and 1967 at Kent State, and in 1978 and 1982 the university "received information concerning discrepancies in [their] official academic records." 22 Ohio St.3d at 55, 488 N.E.2d at 851. Thereafter, the university investigated and determined that Waliga and Taylor "had failed to complete the substantive degree requirements." Id. The university then advised Waliga and Taylor that it was contemplating revoking their degrees and invited them to appear before the College Advisory Council to review the documents and present their evidence. They did not appear, however, and the Council, after the hearing, recommended to the university that the degrees be revoked. Before action was taken, Waliga and Taylor brought a declaratory action in an Ohio court "regarding the authority of the university to revoke degrees previously conferred" upon them. Id. The trial court posed these issues: "(1) 'May the present Board of Trustees of Kent State University revoke a degree issued some 15 years prior?' and (2) '[i]f the Board has the authority, what procedure should be followed, who has the burden of proof, and are the plaintiffs entitled to legal representations in all stages of that [sic ] proceedings?' " Id. (quoting trial court). The trial court answered the first question in the negative and therefore did not answer the second question. The Ohio Court of Appeals affirmed the result, holding that while the university had the power to revoke the degrees, the procedure that the university had followed did not satisfy the law. On review, the Ohio Supreme Court's opinion pointed out that the Court of Appeals' ruling that the procedure followed was improper was premature because the degrees had not actually been revoked and the trial court had not ruled on the validity of the procedure. The Ohio Supreme Court then stated the issue before it as follows: "The sole issue raised by this case is whether the university has the authority and power to revoke improperly awarded degrees. The procedural issues before the trial court were not addressed, and hence not before this court." 22 Ohio St.3d at 56, 488 N.E.2d at 851-52 (footnote omitted).
 
 
 19
 The Ohio Supreme Court determined that Kent State did have the authority and power to revoke the degrees. The "Syllabus by the Court," which under Ohio law is the only holding in such an opinion, Ohio Rev.Code Ann. Sec. 2503.20; Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 441, 72 S.Ct. 413, 416, 96 L.Ed. 485 (1952), states: "Boards of trustees of colleges and universities have inherent authority to revoke previously granted academic degrees for proper cause after affording constitutionally adequate procedures." Waliga, 22 Ohio St.3d at 55, 488 N.E.2d at 850. The court relied in part on Ohio Rev.Code Ann. Sec. 3341.05, which authorized Kent State to confer degrees customarily conferred by colleges, and upon Ohio Rev.Code Ann. Sec. 3341.04, which authorized Kent State "to do all things necessary for the ... successful ... operation" of the university. 22 Ohio St.3d at 57, 488 N.E.2d at 852.
 
 The Ohio court then stated:
 
 20
 We consider it self-evident that a college or university acting through its board of trustees does have the inherent authority to revoke an improperly awarded degree where (1) good cause such as fraud, deceit, or error is shown, and (2) the degree-holder is afforded a fair hearing at which he can present evidence and protect his interest. Academic degrees are a university's certification to the world at large of the recipient's educational achievement and fulfillment of the institution's standards. To hold that a university may never withdraw a degree, effectively requires the university to continue making a false certification to the public at large of the accomplishment of persons who in fact lack the very qualifications that are certified. Such a holding would undermine public confidence in the integrity of degrees, call academic standards into question, and harm those who rely on the certification which the degree represents.
 
 
 21
 Id.
 
 
 22
 This statement by the court succinctly points up an important difference between revocation of a degree that has been granted on the one hand and rescission of a sale of land or a gift of personalty on the other. This difference is that upon the grant of a degree, the university certifies to the world that the recipient has fulfilled the university's requirements, and this certification continues until the degree is revoked.
 
 
 23
 In reaching its conclusion, the Ohio court also opined that the common law authorizes a university to revoke a degree for cause, citing The King v. University of Cambridge (Bentley's Case ) (K.B. 1723), 8 Modern Rep. (Select Cases) 148, 2 Ld.Raym. 1334, which so holds.[3]
 
 
 24
 We therefore hold that under Michigan law the Regents of the University of Michigan had the authority and power to revoke Crook's degree without going to court.[4]
 
 THE FEDERAL DUE PROCESS ISSUE
 
 25
 The remaining question in this appeal is whether Crook was afforded due process of law as is required by the fourteenth amendment. The district court concluded that Crook had been denied both procedural and substantive due process.
 
 Procedural Due Process
 
 26
 The hearing by the Committee that determined that Crook had fabricated data in his thesis consumed eight hours. Crook's legal counsel supplied an experienced court reporter at the hearing who was backed up by her tape recorder. Her entire transcript of the proceedings had been made available and was filed in the district court proceeding. While the court reporter testified in court that the hearing at the University had been a difficult one for her, primarily because of the scientific-technical language frequently used and because of the number of persons participating, we do not understand Crook to contend that this transcript does not at least reasonably reflect the statements, questions and testimony or that it was less accurate than the memories of the participants when they were testifying in court over three years later. Most of the relevant facts leading up to this hearing at the University and subsequent to the hearing were represented by documents, such as letters, that were exchanged and were available and were in the record in the district court. Nevertheless, the district court held a nine-day evidentiary hearing to determine what process was afforded to Crook.
 
 
 27
 In her "Findings of Fact," 584 F.Supp. at 1533-52, the district judge presents a kind of wide-ranging recital of the facts leading up to the hearing, of the hearing at the University, and of the subsequent proceedings resulting in the revocation of the degree by the Regents. Many of these findings apparently were intended by the district judge to reflect her feelings about this case and were not intended to be legally consequential. In this published discourse, the district judge takes occasion to make somewhat acerbic statements about various University personnel who played a part in the revocation of Crook's degree, but, it turns out, these deficiencies or defects that she finds had little or nothing to do with her conclusion that Crook had been denied procedural and substantive due process. In short, the statements are largely, if not totally, gratuitous.[5]
 
 
 28
 In reading the transcript of the trial proceeding, it is often difficult to determine what the issues were that the district court considered it was trying. For example, at times it would appear--from the questions posed and answered--that the issue the district court was trying was not whether there was enough evidence of fabrication of thesis data adduced in the University's proceedings to satisfy the requirement of substantive due process but, rather, was whether Crook was, as an original matter, actually guilty of fabrication. At other times, the court, recognizing that the real issue was the quantity and quality of the evidence of fabrication of thesis data adduced in the University's proceedings, would sustain an objection on the basis that a question posed by counsel, it appeared to the court, was aimed at determining the ultimate truth, and the court would then admonish the parties that such was not the issue.[6] At times, it would appear from questioning that claimed negligence on the part of the faculty members who reviewed the thesis when it was submitted and failed to detect the fabrication would itself be a basis for setting aside the rescission of the degree; at other times it appears that such evidence was received to show that, since the faculty had not raised the question of fabrication at that time, there was in fact no fabrication of thesis data.
 
 
 29
 Arguments by counsel, sometimes lengthy and faintly masquerading as questions to a witness, were frequently made during the trial, which also tended to obscure the issues being tried.
 
 
 30
 Before dealing with the district court's conclusion that Crook was denied procedural due process in all possible respects, it is necessary that we outline somewhat more fully the facts leading up to the University's proceedings and the proceedings resulting in the revocation.
 
 
 31
 Crook was awarded a degree of Master of Science in Geology and Mineralogy by the University on April 30, 1977. His thesis, submitted to meet a requirement for a master's degree, purported to describe a theretofore unknown mineral, which Crook called "texasite." Crook stated that he had discovered this new mineral while on a field trip in Texas. Available at the University was an electron microprobe, and Crook represented in his thesis that, with this microprobe, he had produced data which, when processed there with a computer program called EMPADR, showed that the chemical composition of "texasite" was such that it was indeed a previously unknown, naturally occurring mineral.
 
 
 32
 In the latter part of 1978, after receiving an allegation that Crook had, after leaving the University, fabricated data in evaluating a mineral, professors in the Geology and Mineralogy department investigated and tentatively determined that Crook had not actually carried out the electron microprobe-cum-computer analysis as represented in his master's thesis. One reason for this suspicion was that the time log upon which a record of the use of the microprobe was kept indicated that Crook had not used the microprobe nearly enough, the professors thought, to have developed the data that were presented in the thesis. Another reason was that the thesis data as claimed by Crook were, upon reflection, really too good to be true in that the figures were so precise as to indicate that they were a product of working backward from a desired result. The department members also suspected that this "texasite," claimed by Crook to be a natural mineral, was in fact synthetic; the basis of this suspicion was, among other things, that the claimed chemical composition of the allegedly new, natural mineral was so close to that of a synthetic material which had been produced in a laboratory at the University, and a sample of such synthetic material, which had been available to Crook, was now missing. There were other questions raised concerning the validity of the thesis, but these turned out not to be the determinative ones before the hearing Committee.
 
 
 33
 The department invited Crook to return to the University to rerun his electron microprobe data on a computer using an improved EMPADR program. Crook purported to do this in February of 1979, and he delivered the results to the department. However, his work on the computer was, unknown to him, monitored on another computer. This showed that, contrary to his representation, he had simply put data into the computer that he wanted it to give back. Upon his being confronted with this deception, Crook admitted that he had delivered to the department EMPADR "results" that were not developed by the computer from his electron microprobe data. The department concluded that Crook's thesis' contention that his "texasite" was a new, natural mineral was false and that the data in the thesis represented by him to support this claim were fabricated.
 
 
 34
 On April 10, 1979, the Dean of the Graduate School informed Crook by letter that the Department of Geology and Mineralogy was charging him with fabrication of the data claimed by him in the thesis to have been developed by him. Specifically, the letter charged, inter alia, that the analytical results were uniformly so highly precise as to be suspect, that the time consumed by Crook in the analysis was insufficient to support the claimed results, and that the "texasite" claimed in the thesis to be a new, natural mineral was in fact a synthetic analogue. The letter explained that an Ad Hoc Disciplinary Committee of faculty members had been appointed to hear the matter. Procedures were outlined and later amended. Crook was warned that if the charges were proved, his master's degree might be revoked. The date of the hearing was initially set for May 14, 1979.
 
 
 35
 Crook almost immediately employed an experienced trial attorney, John Dethmers, of Lansing, Michigan who represented Crook throughout the proceedings at the University up to and including an appearance before and argument to the Board of Regents when it voted to revoke the degree. Shortly after he was employed, he obtained a continuance of the hearing to September 22, 1979.
 
 
 36
 On the Committee to hear the charges were four faculty members, none of whom were from the Department of Geology and Mineralogy, and three of whom were in science or engineering fields; the fifth member, Rosberg, a law professor and a non-voting member unless there was a tie, was designated as chairman.
 
 
 37
 On June 20, 1979, the department filed with the Committee and served on Crook a much more complete and scientific statement of charges with supporting documents, and, within a couple of weeks, the department served two additional documents when they became available. Although it was contemplated that Crook would respond by August 1, he did not file his response until September 7. The department then filed some rebuttal documents on September 19. The hearing was held on September 22, 1979.
 
 
 38
 At the hearing, in addition to the Committee, were Crook, his wife, his parents, and his lawyer, Dethmers. Also present were professors in the Geology Department, other persons who would likewise make statements, and Roderick Daane, who was general counsel of the University. At the request of Dethmers, all persons who were expected to and who did testify or make statements were sworn by the court reporter at the inception of the hearing. Opening statements were made by Professor Kelly, chairman of the department, Daane, Crook and his attorney, Dethmers.
 
 
 39
 It was a part of the procedure that had been established that while Crook was entitled to be represented by counsel, his counsel would not be allowed to examine and cross-examine witnesses. Neither Daane, for the department, nor Dethmers, for Crook, was allowed to do this, although the record reflects that Dethmers did in fact pose a few questions and make some statements during the proceeding.
 
 
 40
 The record reflects that the procedure followed by the Committee was an informal one. The Committee asked questions and the participants, including Crook, made statements and asked questions. Both the department and Crook were allowed to make submissions after the hearing and to comment on the submissions of the other. The hearing consumed eight hours, all in one day.
 
 
 41
 In its report, filed on March 7, 1980, the Committee stated that the burden was on the department to prove its charges by "clear and convincing" evidence. The report then carefully reviewed the evidence in great detail and found that the department had so proved that Crook had fabricated his thesis data submitted to prove that "texasite" was a new, natural mineral. The report further stated that the Committee felt that it was not competent to determine whether the material that had been the subject of the thesis was a natural mineral or was synthetic material that had been produced by another in a laboratory at the University. The Committee did not make a recommendation as to what action should be taken as a result of the fraud it found.
 
 
 42
 The Executive Board of the Graduate School, after considering Crook's response to the Committee's report, on May 7, 1980, unanimously voted to recommend rescission of Crook's degree. This recommendation was then to be reviewed by the Vice-President of Academic Affairs, Dr. Alfred Sussman, who, however, recused himself because he had drafted the original charges. In his stead, the recommendation was reviewed by Vice-President Dr. Charles G. Overberger, a scientist in charge of scientific research, who had not been involved in the matter. On July 18, 1980, Dr. Overberger sent a memorandum to the Regents stating that he had reviewed the Committee's report and recommended that the Regents rescind Crook's degree.
 
 
 43
 On October 16, 1980, the Regents had the question of the rescission of Crook's degree on their agenda. The report of the Committee and the recommendation of the Executive Board of the Graduate School and Dr. Overberger were before them. Crook's attorney, Dethmers, argued his client's case to the Regents. The Regents voted to rescind the degree.
 
 
 44
 The district court concluded that Crook's master's degree constituted an important property interest and that, in revoking the degree for fabrication of thesis data, an important liberty interest was also implicated. Since the Regents do not contend, at least on this appeal, the contrary, we assume these propositions, arguendo, and accept them as givens.
 
 
 45
 The district court found that Crook was denied a due process right to notice and an opportunity to be heard.
 
 
 46
 In Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), cited and relied upon by the district court, the Court held that a student suspended for ten days from a public high school for misconduct was entitled to "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story" either before or within a reasonable period of time after the suspension. Id. at 581, 95 S.Ct. at 740. While pointing out the difference between a disciplinary and an academic decision, the Regents acknowledge that their decision rescinding this degree had some aspects of both and therefore do not argue that Crook was not entitled to the notice contemplated by Goss.
 
 
 47
 As heretofore stated, the Committee determined that Crook had fabricated the thesis data on which he based his finding that "texasite" was a newly-discovered, natural mineral, and this was the only basis for the rescission of the degree. The question then becomes: did Crook have notice of this charge and the evidentiary basis for this charge? It appears to us beyond peradventure that Crook did have such notice. The letter sent to Crook on April 10, 1979 by the Dean of the Graduate School stated, inter alia, that thesis data fabrication was charged and that the time consumed by Crook in the analysis was insufficient to support the claimed results. Then, on June 30, 1979, the department served on Crook a much more complete statement of charges, supported by documents, which again made this charge. That Crook understood this charge and the basis for the charge is made clear by Crook's repeating the charge in his response filed on September 7, 1979. We quote: "Mr. Crook did not have sufficient time on the microprobe to have analyzed all the samples reported in the thesis, and therefore must have fabricated analyses which appear in his thesis."
 
 
 48
 With respect to Crook's opportunity to be heard, it is without dispute that, in addition to the abundant notice we have just described, he had counsel from the beginning who dealt with the University, he had the opportunity to and did file a response to the charges that was supplemented after the hearing, he had the opportunity to present witnesses and to have an expert with him at the hearing, he and his counsel both made opening statements at the hearing and his counsel was free to advise him, and he made statements and asked questions of the other witnesses. Moreover, Crook filed exceptions to the Committee's findings and his attorney argued his case before the Regents. Though the district court in its opinion described the hearing presided over by Professor Rosberg as a "circus-like free-for-all," 584 F.Supp. at 1556, the full transcript that is in the record makes clear that it simply was an informal rather than a trial-type hearing.
 
 
 49
 We therefore conclude, in sum, that the district court's determinations that Crook was denied procedural due process in that he did not have notice and an opportunity to be heard were clearly erroneous.
 
 
 50
 The district court also determined that Crook was denied procedural due process because his attorney, Dethmers, was not allowed to examine and cross-examine witnesses.
 
 
 51
 Although Crook's attorney stated at the inception of the hearing: "No way do I want to try to turn this into a courtroom proceeding," the Regents do not contend that the right to examine and cross-examine witnesses was waived. And although Dethmers did ask a few questions and make some comments other than his opening statement, the Regents do not deny that he was not afforded the right to examine and cross-examine. The ground rules that had been established for the hearing clearly proscribed such activity by counsel for either side.
 
 
 52
 The district court found Crook's procedural due process right to have counsel examine and cross-examine witnesses in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). There, the Court held that welfare recipients are entitled to a hearing before their benefits are cut off and that, if they have counsel, they have a right to have counsel cross-examine adverse witnesses. In reaching this result, the Court pointed out that such recipients would be in dire circumstances once their welfare benefits are improperly withdrawn and that, therefore, fairness required that the right of cross-examination be afforded to reduce the incidence of illegal withdrawal of benefits. The Court distinguished the plight of blacklisted government contractors, discharged government employees, and taxpayers denied tax exemptions as being less serious than that of the eligible welfare recipient whose benefits are withdrawn.
 
 
 53
 The district court was aware of and discussed the opinion of this court in Frumkin v. Board of Trustees, 626 F.2d 19 (6th Cir.1980), which held that a tenured college professor, who was discharged for stated reasons that adversely reflected upon him, was not entitled to have his counsel examine and cross-examine witnesses at the hearing that resulted in such findings. In reaching this result, this court discussed Goldberg v. Kelly, supra, and stated:
 
 
 54
 We cannot, however, accept appellant's contention that we should rule in his favor on the basis of an analogy between the problems which beset an unrepresented welfare recipient confronted with an administrative court and the position of a professional academic who, under the direction of his attorney, presents his case to a panel of fellow faculty members.
 
 
 55
 626 F.2d at 21.
 
 
 56
 This court in Frumkin then discussed and applied the balancing test as set out in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (as did the district court here) and concluded, as stated, that Frumkin did not have a procedural due process right to have his attorney examine and cross-examine witnesses.
 
 
 57
 While there are differences between the case before us and that presented in Frumkin, we conclude that there are very important similarities and that the instant case is much closer to Frumkin than it is to Goldberg v. Kelly. In both Frumkin and here, we have academic decisions being made in academic surroundings. While Crook's loss of his master's degree on the basis of fraud meant the loss of an important property interest and implicated injury to a liberty interest, the same can be said of the loss of a tenured professorship on findings that severely attacked the professor's character and competence. Both in Frumkin and here the parties asserting the right to have their counsel examine and cross-examine witnesses are themselves highly educated persons with expertise in the fields that were the subject of the investigation.
 
 
 58
 We conclude, therefore, that the district court was in error in determining that Crook was denied procedural due process because his attorney was not allowed to examine and cross-examine witnesses.
 
 
 59
 Although the district court determined that Crook, himself, did not have a reasonable opportunity to cross-examine at the hearing, we believe that the record clearly shows that he did have such opportunity with respect to the question whether he had used the microprobe enough to have developed the data submitted in his thesis.
 
 
 60
 The district court, under a heading in its opinion styled, enigmatically, "Evidence To The Decision Maker," holds that Crook was denied procedural due process because he was denied an opportunity to make an oral presentation to the decision maker. 584 F.Supp. at 1561. The court relied on a holding in Goldberg v. Kelly, supra, that due process in that context required an opportunity to make an oral presentation to the person who made the decision to withdraw welfare benefits. In this case, however, without dispute Crook's counsel, Dethmers, made an oral argument to the Board of Regents at the time the Regents voted to revoke his degree. Moreover, under the holding of this court in Bates v. Sponberg, 547 F.2d 325 (6th Cir.1976), due process did not require that the Regents, who had the Committee's report, review the transcript of the hearing. Accordingly, we conclude that there was not a due process deprivation here.
 
 
 61
 The district court, under a heading styled "Decision Based on Evidence," again relying on Goldberg v. Kelly, supra, held that Crook had been denied procedural due process in still another respect. It is unclear whether the district court intended to hold that the defect was the consideration of hearsay evidence or was the consideration of evidence to which Crook had no opportunity to respond, or both. It is clear that admission of hearsay evidence is not a denial of procedural due process. Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). That case involved the familiar situation of the admission in evidence of medical reports in Social Security cases. It is true that submissions were made to the Committee by both sides and copies exchanged after the formal hearing, and the chairman, with the knowledge and consent of Crook, after the hearing contacted certain persons suggested by Crook in an effort to rebut the strong case that had been presented to the Committee that Crook had indeed fabricated thesis data. However, and in any event, as will be seen in the discussion, infra, of the substantive due process issue, the evidence upon which the Committee determined that Crook had fabricated thesis data was presented prior to and at the hearing, and Crook had an opportunity to attack all of it. Moreover, Crook's attorney stated at the hearing that there was no objection to such documentary evidence as being hearsay. App. at 2093. There was no denial of procedural due process here.
 
 
 62
 The district court, after citing cases holding that the decision maker must be impartial (with which proposition the Regents do not disagree), concludes that Crook was denied procedural due process because: "Here, the 'decision' was cast by persons whose impartiality has been impugned, and adopted by defendants without hearing." 584 F.Supp. at 1562. Even if the decision was made "by persons whose impartiality has been impugned," that is nothing more than a finding that their impartiality has been assailed. It is not a finding that these persons were not impartial. In any event, at the opening of the Committee's hearing, Rosberg, the chairman, stated that there had been no challenges to the members of the Committee and, after invitation, no challenges were made then. Moreover, while Rosberg, prior to the hearing, had read the materials that had been submitted and felt that the department had a strong case, there is no evidence in the record that Rosberg or the other members of the Committee were partial, or that the Executive Committee of the Graduate School was partial, or that Vice-President Overberger was partial, or that the Regents were partial.
 
 
 63
 Accordingly, the finding that the "decision maker" was not impartial, if that was the intent of the district court, is clearly erroneous.
 
 Substantive Due Process
 
 64
 The district court held that, in rescinding Crook's degree, Crook was also denied substantive due process in that "there was no rational basis" for the rescission. 584 F.Supp. at 1562.
 
 
 65
 The basis for the revocation was, of course, a finding by the Committee that Crook had fabricated the thesis data which, Crook claimed, showed that his "texasite" was a new, natural mineral.
 
 
 66
 In Regents of the University of Michigan v. Ewing, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the question was whether a medical student, who was in the six-year Inteflex program, in which one could receive an undergraduate and a medical degree, and who had failed an examination and was released from the program, had been deprived of substantive due process. His contention was that he was so deprived because others who had failed were allowed to retake the examination and he was not. Because it was not necessary to decide the constitutional issue, the Court determined that it would, as it had done in an analogous context in Board of Curators v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), assume, without deciding, "that federal courts can review an academic decision of a public educational institution under a substantive due process standard." 474 U.S. at ----, 106 S.Ct. at 511-12, 88 L.Ed.2d at 530.[7] The Court then stated:
 
 
 67
 Ewing's claim, therefore, must be that the University misjudged his fitness to remain a student in the Inteflex program. The record unmistakably demonstrates, however, that the faculty's decision was made conscientiously and with careful deliberation, based on an evaluation of the entirety of Ewing's academic career. When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.
 
 
 68
 Id. at ----, 106 S.Ct. at 513, 88 L.Ed.2d at 532 (footnote and citations omitted).
 
 
 69
 The Regents in the instant case argue, in resolving the substantive due process issue, that the standard so applied in Ewing is precisely applicable in this case. However, we do not need to decide whether this standard is so applicable here because we find that the Committee not only exercised professional judgment but also that the evidence of fabrication was such that the determination by the Committee was not arbitrary or capricious and therefore substantive due process was not denied. Horowitz, 435 U.S. at 91, 98 S.Ct. at 955-56.
 
 
 70
 Upon reviewing the materials submitted to the Committee by the parties prior to its hearing, which were available to both sides and to the Committee, and upon reviewing the transcript of the hearing and the Committee's report finding the thesis data to be fabricated, we conclude that not only was the finding not arbitrary or capricious or lacking in a rational basis, but rather the finding was supported by clear and convincing evidence.
 
 
 71
 To have obtained the data from use of the microprobe as claimed by Crook, it would have consumed at least 200 to 400 hours of use. Crook testified at the hearing that he thought it would take 400 to 600 hours. App. at 2109. However, from the logs upon which use of the microprobe was recorded and testimony of the parties in position to have knowledge of this use, the proof is overwhelming that Crook did not come close to using the microprobe to that extent.
 
 
 72
 While it was department policy and proper scientific practice to retain the original data from the microprobe work and the use of the EMPADR program, of which Crook was aware, he could produce none of this. Further, as the Committee found, Crook's explanations for not having these materials were not believable, and Crook admitted that he had lied when he stated he had rerun the microprobe data with the EMPADR program when he returned to Ann Arbor in February of 1979.
 
 
 73
 Crook, in order to show that he had used the microprobe more than the log would indicate, contended he often signed the name of another on the log, but there was no apparent reason for such deception if, in fact, Crook did practice it. The graduate student whose name Crook claimed he signed denied that this was so. Moreover, even if Crook had signed the name of others as he claimed, it was clear, nevertheless, that he had not used the microprobe nearly enough to have developed the data that he reported in the thesis.
 
 
 74
 There is much additional support in the record and set out in the Committee's report for the conclusion of the Committee that Crook had fabricated thesis data, but the foregoing should be sufficient to demonstrate that the Committee's findings were not arbitrary or capricious.
 
 
 75
 We, therefore, conclude that the finding by the district court that Crook was denied substantive due process is clearly erroneous.
 
 CONCLUSION
 
 76
 In the covering letter with which the Committee forwarded its report to the Graduate School, it was suggested that, while the Department of Geology must assume its graduate degree candidates to be honest, this unfortunate occurrence might not have happened if the department had exerted somewhat closer oversight over its graduate students and more care in reviewing their theses. It was suggested that "further inquiry into the Department's program is warranted."
 
 
 77
 This case does indeed present an unfortunate and sad occurrence, which may well have been avoided with closer supervision and repetition of which should be avoided. However, we are satisfied that the Regents of the University of Michigan had the authority to revoke Crook's degree and that, in doing so, they did not deprive him of due process of law under the federal Constitution.
 
 
 78
 The judgments of the district court declaring the rescission of the degree to be a nullity, enjoining the Regents to restore the degree, and granting attorney fees are VACATED and the cause is REMANDED with instructions to dismiss this action.
 
 
 
 [1]
 For jurisdiction, the complaint relies upon 28 U.S.C. Secs. 1331, 1332 and 1343
 
 
 [2]
 The University contends that the record shows that the University of Michigan and many other universities have in fact rescinded the grant of degrees, Supp. brief at 2, but apparently these actions have spawned no reported decisions
 
 
 [3]
 In an unreported case decided by Division 1 of the Second District of the California Court of Appeal, Abalkhail v. Claremont University Center, No. B014012 (Cal.Ct.App. Feb. 27, 1986), cert. denied, --- U.S. ----, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986), which involved a revocation by a private university of a degree for plagiarism in a thesis, the court recognized, sub silentio, that the university had the authority to revoke a degree, and applied state common law in concluding that the requirements of due process had been met. It appears clear to us that the due process requirements applied there were met here
 
 
 [4]
 We have decided that Michigan law does not require the Regents to go to court to obtain a revocation of Crook's degree, and it appears that Michigan had no other requirement for revocation that would not be satisfied if the standards of federal due process were met. The Michigan Administrative Procedures Act, Mich.Comp.Laws Ann. Secs. 24.201 et seq., does not apply to the University. Id. Sec. 24.203(2)
 
 
 [5]
 As a mild example of these statements, we quote the following one concerning Professor Rosberg, the law school professor who chaired the hearing committee and who wrote most of the report unanimously agreed to by the other members finding that Crook had been guilty of fraud with respect to his thesis:
 Gerald R. Rosberg, Esq., a graduate of the Harvard Law School, and former law clerk to a United States Circuit Judge [Bazelon] and United States Supreme Court Justice [Brennan], was in his fifth year on the law school faculty, teaching civil procedure and legal process, inter alia. Despite his impressive credentials, Rosberg had no experience as a litigator.
 
 
 [584]
 F.Supp. at 1540 (emphasis added)
 The statement about Professor Rosberg's lack of experience as a litigator is apparently true, but there is not even a hint in the opinion that, to afford due process, it was necessary that the Committee be chaired by a lawyer with such experience.
 
 
 [6]
 Nevertheless, the district court, in its opinion, after all appeared to consider the ultimate truth of the fraud charge to have been an issue in the proceeding before it because it took the opportunity to say that, to the extent this was an issue, it believed Professor Donald Peacor of the Geology Department to have been a liar and that he had "overwhelming personal animus" towards Crook. 584 F.Supp. at 1551
 
 
 [7]
 We make the same assumption for the same reason. However, since the decision here involved a revocation of a vested right for fraud in the inducement, clearly the argument for review under a substantive due process standard is stronger here than in Ewing